110 T.C. No. 7

UNITED STATES TAX COURT

BILL L. AND PATRICIA M. SPENCER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JOSEPH T. AND SHERYL S. SCHROEDER, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 16338-95, 22465-95.    Filed February 9, 1998.

    <u>Held</u>, inter alia, upon redetermination of the original amortizable bases of property owned by P's S corporations, amortization must be calculated using the bases of the property as reduced by previously allowed amortization deductions.

<u>Oliver C. Murray, Jr.</u>, and <u>Stephen S. Ritchey</u>, for petitioners.

<u>Bonnie L. Cameron</u>, for respondent.

WELLS, <u>Judge</u>:  The instant cases were consolidated for purposes of trial, briefing, and opinion, and will hereinafter be referred to as the instant case.  Respondent determined deficiencies in petitioners' Federal income tax, additions to tax, and accuracy-related penalties as follows:

<u>Bill L. and Patricia M. Spencer, docket No. 16338-95</u>:

| <u>Year</u> | <u>Deficiency</u> | Additions to Tax <u>Sec. 6651(a)(1)</u> | Penalties <u>Sec. 6662</u> |
|------|------------|---------------------|-------------|
| 1990 | $696 | – | $139 |
| 1991 | 41,396 | $10,335 | 8,279 |
| 1992 | 32,479 | – | 6,496 |

<u>Joseph T. and Sheryl S. Schroeder, docket No. 22465-95</u>:

| <u>Year</u> | <u>Deficiency</u> | Additions to Tax <u>Sec. 6651(a)(1)</u> | Penalties <u>Sec. 6662</u> |
|------|------------|---------------------|-------------|
| 1991 | $12,298 | – | $2,460 |
| 1992 | 8,023 | $1,731 | 1,605 |

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of

Practice and Procedure.  After concessions[1] by the parties, the

---

[1]     In the notice of deficiency, respondent determined that certain advances made by subchapter S corporations Spencer Pest Control of South Carolina, Inc. (SPC-SC), and Spencer Pest Control of Florida, Inc. (SPC-FL), to petitioners were taxable distributions.  Respondent concedes that the advances were, in fact, loans made by the corporations to petitioners.
        Respondent further determined that petitioners were liable for (1) additions to tax pursuant to sec. 6651 for failure to file timely Federal income tax returns for taxable years ending Dec. 31, 1991 and 1992, respectively, and (2) accuracy-related penalties pursuant to sec. 6662 for negligence or disregard of the rules or regulations.  Petitioners concede the sec. 6651 additions to tax and respondent concedes the sec. 6662 accuracy-related penalties.
        Additionally, respondent determined that for the years in issue certain computational adjustments should be made, with respect to Bill L. and Patricia M. Spencer (collectively, the Spencers), which would:  (1) Increase their charitable contribution deduction for taxable years 1990 and 1991; (2) reduce their itemized deductions for taxable years 1991 and 1992; (3) reduce their deduction for exemptions for taxable years 1991 and 1992; and (4) entitle them to utilize their investment tax credit carryover from prior years for taxable year 1990.  These adjustments stem from other adjustments that had the effect of increasing the Spencer's adjusted gross income (AGI).  Respondent agreed to accept, as filed, the miscellaneous deductions subject to AGI claimed by the Spencers for taxable years 1991 and 1992. The remaining adjustments are merely mathematical adjustments that the parties can make in the Rule 155 computation that we order below.  Respondent further determined that the Spencers were not entitled to deduct, as miscellaneous itemized deductions, amounts that were incurred as legal expenses in connection with their chapter 11 bankruptcy proceedings for taxable years 1991 and 1992.  Respondent now concedes that they properly claimed, and were entitled to deduct, such legal expenses for taxable years 1991 and 1992.
        Similarly, as to Joseph T. and Sheryl S. Schroeder (collectively, the Schroeders), respondent determined that for the taxable years in issue certain computational adjustments should be made which would:  (1) Reduce allowable medical deductions to zero, and (2) reduce the allowable child care credit percentage to 20 percent.  As stated previously, these adjustments are merely mathematical adjustments that the parties can make in the Rule 155 computation that we order below.

(continued...)

issues to be decided are as follows:

(1)  Whether, within the meaning of section 1366(d)(1)(B), certain transactions in which certain petitioners acquired assets from Spencer Services, Inc. (SSI), and subsequently conveyed such assets to Spencer Pest Control of South Carolina, Inc. (SPC-SC), and Spencer Pest Control of Florida, Inc. (SPC-FL), gave basis to the shareholders of the transferee corporations;

(2)  whether, within the meaning of section 1366(d)(1), petitioner Bill L. Spencer (Mr. Spencer) had basis in SPC-SC as a result of a bank loan made directly to SPC-SC and guaranteed by him; and

(3)  whether amortization allowable to SPC-SC and SPC-FL for taxable years after 1990 should be computed based on (1) the corrected amortizable basis of the property, without regard to previously allowed amortization deductions, as petitioners contend, or (2) the corrected amortizable basis, as reduced by

---

(...continued)

Finally, at trial, respondent reserved the right to argue the applicability of sec. 465 as it relates to shareholder basis in a small business corporation.  On brief, however, respondent advanced no sec. 465 argument.  Accordingly, we conclude that any such argument was abandoned by respondent.  Rybak v. Commissioner, 91 T.C. 524, 566 (1988).

previously allowed amortization deductions, as respondent contends.

FINDINGS OF FACT

Some of the facts have been stipulated for trial pursuant to Rule 91. The parties' stipulations of fact are incorporated herein by reference and are found as facts in the instant case.

Petitioners Bill L. and Patricia M. Spencer (collectively, the Spencers), husband and wife, resided in Roswell, Georgia, at the time they filed their petition in the instant case. Petitioners Joseph T. and Sheryl S. Schroeder (collectively, the Schroeders), husband and wife, resided in Melbourne Beach, Florida, at the time they filed their petition in the instant case. Sheryl Schroeder is the daughter of the Spencers.

Background

Mr. Spencer graduated from Ohio University during 1966 with a major in accounting and minors in finance and taxation. While living in Columbus, Ohio, he worked as a cost accountant for several companies. During 1966, he moved to Miami, Florida, where he worked as an accountant for an accounting firm, doing primarily audit work and tax return preparation. By 1968, Mr. Spencer began working as the comptroller for a real estate firm known as the Alan Morris Co. (Alan Morris), where he later became

the treasurer and chief financial officer.  During 1971, while at Alan Morris, Mr. Spencer became involved in the acquisition and sale of pest control companies.

Mr. Spencer remained with Alan Morris until 1979 when he organized SSI.  Since SSI's inception, Mr. Spencer has been employed with SSI which was a C corporation.  Mr. Spencer was SSI's majority shareholder, owning 87 percent,[2] at all times relevant to the transactions in the instant case.

SPC-SC Transaction

During 1987, SSI nominally sold its South Carolina operations to Mr. Spencer and one of SSI's top managers, Toney Boozer (Mr. Boozer), in exchange for $1,170,000.  Shortly thereafter, Mr. Spencer and Mr. Boozer nominally conveyed those same assets to a newly organized S corporation, SPC-SC, in exchange for $1,170,000.  Mr. Spencer caused SSI to sell its South Carolina assets and operations in an effort to consolidate operations and improve managerial efficiency.  The foregoing transactions (collectively, the SPC-SC transaction) are described in detail below.

Carolina Transaction

On May 21, 1987, prior to the organization of SPC-SC, Mr. Spencer and Mr. Boozer entered into an agreement (the Carolina

[2]    The record does not disclose who owned the remaining 13 percent of SSI's stock.

Purchase Agreement) to purchase, as of June 1, 1987, certain assets of SSI, Efird's Pest Control Co. of Charleston, Inc., Efird's Exterminating Co., Inc., of South Carolina, and Efird's Pest Control Co. of Greenville, Inc. (collectively referred to as SSI), in exchange for $1,170,000 (sometimes referred to herein as the Carolina transaction).[3]  The SSI entities engaged in the pest control business in and around Summerville, Spartanburg, and Greenville, South Carolina.  With the exception of the South Carolina National Bank (SCNB) loan documents, discussed infra, Mr. Spencer drafted all of the documents relating to the Carolina transaction.

Pursuant to the Carolina Purchase Agreement, Mr. Spencer and Mr. Boozer assumed liabilities in the amount of $54,625.78, and acquired (1) tangible assets in the amount of $70,768.81, and (2) intangible assets in the amount of $1,153,856.97.[4]  The intangible assets acquired included (1) all of SSI's right, title, and interest in its pest control, lawn care, termite treatment, renewal bond accounts, and contract rights, as well as (2) the sole and exclusive right to use the names "Efird's"

_____

[3]     The Efird's entities were operating subsidiaries of SSI.

[4]     For such intangible assets, Mr. Spencer and Mr. Boozer agreed to pay SSI $1,170,000, less the difference between the tangible assets and liabilities assumed.  We note that respondent does not contest the value of the intangible contract rights in issue in the instant case.

and/or "Spencer Pest Control", trademarks, service marks, and patents. The Carolina Purchase agreement also included the following clause:

> Seller agrees and acknowledges that Purchaser intends to transfer the assets purchased and liabilities assumed hereby into a new South Carolina corporation to be formed by Purchaser entitled "Spencer Pest Control Co. of S.C., Inc." and Purchaser agrees to pledge, and Seller agrees to accept, their capital stock in the new company as partial security for their Promissory Note given to seller, as described above.

Additionally, SSI and SPC-SC had a verbal agreement pursuant to which SSI was to continue to do the accounting for SPC-SC in exchange for a fee of $600 per office, per month. They also agreed, verbally, that SPC-SC would pay SSI a consulting fee equal to the amount paid to the highest paid officer of SPC-SC.

a.    Bank Loan

Payment for the acquired assets consisted of $270,000 cash and a $900,000 promissory note issued by Mr. Spencer and Mr. Boozer. On June 3, 1987, SPC-SC borrowed $250,000 of the $270,000 paid in cash from SCNB. The loan (hereinafter referred to as the bank loan) was to be repaid in 36 monthly installments of $6,994.44, including principal and interest.[5] The first

---

[5]    Interest on the bank loan was set at SCN prime plus 1 percent per year. The bank defined "SCN prime" as the floating rate of interest publicly announced from time to time by South Carolina National Bank (SCNB) as its prime rate of interest.

payment on the bank loan was due on July 1, 1987, and the final payment was due on June 1, 1990.

SPC-SC's assets (i.e., the assets acquired in the Carolina transaction) served as security for the bank loan. Additional security included a pledge by Mr. Spencer and Mr. Boozer of their SPC-SC stock and certain real estate[6] as well as the assignment of certain life insurance policies[7] on their lives.

Mr. Spencer and Mr. Boozer jointly and severally guaranteed the bank loan. SCNB initially agreed to make the bank loan directly to Mr. Spencer and Mr. Boozer in their individual capacities. However, upon learning that they intended to resell the acquired assets to SPC-SC, SCNB decided (1) to make the loan directly to SPC-SC, and (2) to require personal guaranties by Mr. Spencer and Mr. Boozer. Additionally, SCNB required that SPC-SC pay the bank loan proceeds directly to SSI.

b.  S/B Note

At closing, Mr. Spencer and Mr. Boozer paid $270,000 in cash and issued a $900,000 promissory note (the S/B note), dated June

---

[6]   Mr. Spencer gave a third mortgage on a piece of commercial real estate in Roswell, Georgia. That parcel of land was also encumbered by three easements and a life estate that Mr. Spencer conveyed to a third party on Apr. 1, 1983. Mr. Boozer gave a second mortgage on his personal residence in Greenville, South Carolina.

[7]   The insurance policy assigned by Mr. Spencer indicated that the maximum amount SCNB could collect was $250,000.

3, 1987, to SSI as payment for the assets acquired in the Carolina transaction.  Mr. Spencer and Mr. Boozer agreed to pay SSI $900,000 with interest, from June 1, 1987, at a rate of 10 percent per year in 120 equal monthly payments.  As was the case with the bank loan, Mr. Spencer and Mr. Boozer were jointly and severally liable on the S/B note.

The S/B note was fully subordinated to the $250,000 bank loan, and payments were to commence on the first day of the month following satisfaction of the bank loan.[8]  The S/B note was secured by (1) a first security interest in the acquired assets, subject only to the bank loan, and (2) by an assignment of all of the issued and outstanding common stock of SPC-SC, also subordinate to the bank loan.  Finally, the S/B note contained the following acceleration clause:

> AND maker hereby agrees that if at any time any portion of said principal or interest shall be past due and unpaid, the whole amount evidenced by this note shall, at the option of the holder thereof, become immediately due, and said holder shall have the right to institute any proceedings upon this note and any collaterals given to secure the same, for the purpose of collecting said principal and interest, with costs and expenses, or of protecting any security connected herewith.

Organization of SPC-SC

SPC-SC was incorporated on June 1, 1987.  The total capital investment in SPC-SC was $1,000, represented by capital stock

---

[8]    Pursuant to the terms of the $900,000 promissory note (S/B note), interest would continue to accrue and would be added to the principal each month until the bank loan was paid in full.

issued to its shareholders, Mr. Spencer and Mr. Boozer.[9] Following SPC-SC's incorporation, Mr. Spencer and Mr. Boozer each owned 50 percent of SPC-SC's stock. During the years in issue, SPC-SC was a calendar year S corporation within the meaning of section 1361. Mr. Spencer was the chief executive officer and treasurer of SPC-SC, and Mr. Boozer served as its chief operating officer. Petitioner Patricia M. Spencer (Mrs. Spencer), also a corporate officer, worked at SPC-SC as an office clerk.

Nominal Resale of Carolina Assets to SPC-SC

During June 1987, the SPC-SC shareholders, Mr. Spencer and Mr. Boozer, nominally conveyed the same assets acquired in the Carolina transaction to SPC-SC in consideration of $1,170,000. Neither that conveyance nor the consideration for the transaction (hereinafter referred to as the SPC-SC nominal debt) was documented.[10]

Payment Flow

All payments on the $900,000 S/B note and the $250,000 bank loan have been made from SPC-SC's current corporate revenues. No payments have been directly made by the SPC-SC shareholders, Mr. Spencer and Mr. Boozer.

---

[9]     Mr. Boozer is unrelated to Mr. Spencer.

[10]     The parties stipulated that the "note" from SPC-SC to the SPC-SC shareholders was never documented. We take this stipulation to mean that the consideration given by SPC-SC to its shareholders took the form of a debt that was never documented by a note.

The S/B note was revised on or about February 1, 1990, and the repayment period was extended from 10 years to 15 years. SPC-SC then commenced payments to SSI during April 1990, but ceased payments during August 1991, when it began experiencing cash-flow problems.  No payments were made for the next 5 months, from September 1991 through January 1992.  The S/B note was again revised on or about December 1, 1992, when the interest rate was reduced from 8 percent to 6.5 percent.

Information Reported by SPC-SC and Mr. Spencer

SPC-SC did not report interest income on its Federal income tax returns for taxable years 1991 and 1992.  SPC-SC, however, deducted the interest it paid to both SCNB and SSI, and interest expense was among the operating expenses that SPC-SC used in arriving at its net operating loss that ultimately passed through to the SPC-SC shareholders.[11]   On their Federal income tax returns, the Spencers claimed the following amounts as Mr. Spencer's share of losses from SPC-SC:

| Year | Amount of Loss Claimed |
|------|------------------------|
| 1990 | $17,741 |
| 1991 | 15,031 |
| 1992 | 37,673 |

SPC-SC issued no Forms 1099 to report interest paid to its shareholders.  On their individual Federal income tax returns,

---

[11]    Mr. Spencer signed SPC-SC's Federal income tax returns for all of the years in issue in the instant case.

the Spencers did not report any interest income from SPC-SC and did not claim any interest deductions for amounts paid to SSI or SCNB.

SPC-SC's corporate returns, Forms 1120S, did not reflect any amount on Schedule L as "loans from shareholders" for taxable years 1990, 1991, or 1992. The debts SPC-SC incurred in purchasing the assets from Mr. Spencer and Mr. Boozer were reflected on Schedule L as "mortgages, notes, and bonds payable in 1 year or more."[12] SPC-SC's Schedules L, for taxable years 1990, 1991, and 1992, reflected that its capital stock was $1,000 and that its paid-in capital was zero. SPC-SC did not list the bank loan on its books as a capital contribution.

SPC-FL Transaction

Three years later, in a similar series of transactions, SSI nominally sold its Florida assets and operations to Mrs. Spencer, the Schroeders, and Lewis Smith (the purchasers) for $1,150,000. The purchasers subsequently nominally conveyed those same assets to a newly organized S corporation, SPC-FL, for $1,150,000. As in the case of the SPC-SC transaction, Mr. Spencer caused SSI to

---

[12] The amounts reflected on SPC-SC's Schedules L as "mortgages, notes, and bonds payable in 1 year or more" are as follows:

| Year | Beginning of Tax Year | End of Tax Year |
|------|----------------------|-----------------|
| 1990 | $1,246,569 | $1,170,308 |
| 1991 | 1,170,308 | 1,161,981 |
| 1992 | 1,161,981 | 1,170,119 |

sell its Florida pest control companies in order to consolidate operations and motivate management. The foregoing transactions (collectively, the SPC-FL transactions) are described in detail below.

Florida Transaction

On August 8, 1990, the purchasers entered into an agreement (the Florida Purchase Agreement) to purchase, as of August 1, 1990, certain assets of SSI, Art Brown Pest Control, Inc., Reese Pest Control Co., and Reese Pest Control Co. of Vero Beach (collectively referred to as SSI)[13] in exchange for $1,150,000. This transaction is sometimes referred to herein as the Florida transaction. SSI engaged in the pest control business in and around Sanford, Melbourne, and Vero Beach, Florida. Mr. Spencer drafted the original documents relating to the Florida transaction. Those documents, however, were lost in a move and are therefore unavailable. Redrafted copies of the purchase agreement and promissory note were submitted into evidence.

Pursuant to the Florida Purchase Agreement, the purchasers assumed liabilities in the amount of $124,351.98, and acquired (1) tangible assets in the amount of $172,392.16, and (2)

---

[13] The record does not disclose the exact relationship between SSI, Art Brown Pest Control, and the Reese entities; it appears, however, that SSI either owned or controlled such entities. Both petitioners and respondent have characterized this transaction as between SSI and the purchasers, and we accept such characterization.

intangible assets in the amount of $1,101,959.82.[14]   The

intangible assets acquired included (1) all of SSI's right,

title, and interest in its pest control, lawn care, termite

treatment, renewal bond accounts, and contract rights, as well as

(2) the sole and exclusive right to use the names "Art Brown Pest

Control", "Reese Pest Control", and/or "Spencer Pest Control",

including any trademarks, service marks, and patents owned by SSI

in the State of Florida.

The Florida Purchase Agreement stated that the "Purchasers

have declared their intention to form Spencer Pest Control Co. of

Florida, Inc., * * * as the Assignee of and Successor in Interest

to the Purchasers' obligations hereunder."  The Florida Purchase

Agreement also contained the following clause:

> Purchasers agree to incorporate in the State of Florida
> as Spencer Pest Control Co. of Florida, Inc., with
> capital shares to be allocated in the following
> percentages:

| | |
|---|---|
| Patricia M. Spencer | 50% |
| Joseph T. Schroeder | 25% |
| Sheryl S. Schroeder | 20% |
| Lewis E. Smith, Jr. | 5% |

> The above-referenced percentages shall represent the
> Purchasers' individual interest and responsibilities in
> this Agreement until such time as Spencer Pest Control
> Co. of Florida, Inc., is incorporated, at which time
> all individual obligations of Purchasers to Sellers
> under this Agreement shall be accepted by Spencer of
> Florida.  Sellers acknowledge and agree to the

---

[14]   As stated previously, respondent does not contest the value
of the intangible contract rights in issue in the instant case.

acceptance of Spencer of Florida as the Assignee of and Successor in Interest to the Purchasers.

The Florida Purchase Agreement contained a clause pertaining to certain accounting and consulting services to be provided to SPC-FL by SSI and Mr. Spencer.  In exchange for the performance of required monthly financial accounting services, SPC-FL agreed to pay SSI a monthly fee of $1,800.  Additionally, the parties agreed that SPC-FL would retain either SSI or Mr. Spencer to provide management consulting services at a monthly fee equal to the compensation paid by SPC-FL to either Mr. Schroeder or the highest paid employee of SPC-FL, whichever is greater.  Both of these arrangements were to be in effect as long as there was any debt outstanding to the seller, SSI.

Unlike the SPC-SC transaction, no cash was paid at closing. Payment for the acquired assets consisted solely of a $1,150,000 promissory note (the S/S/S note), dated August 8, 1990, issued by the purchasers.  Pursuant to the S/S/S note,[15] the purchasers agreed to pay SSI $1,150,000 with interest at the rate of 10 percent per year in 120 equal installments of $15,197.33.  The first payment was due and payable on September 1, 1990.  The S/S/S note contained the following acceleration clause:

> Without notice, the Lender may declare all amounts due and payable pursuant to this note immediately due and payable, if the Borrowers (or any one of them):

---

[15]    As stated previously, the original documents relating to this transaction are unavailable.

a. defaults in making payments on this Note when due;

b fails to timely pay any other indebtedness owed to this Lender;

c. dies or becomes incompetent;

d. creates, without express written permission of the Lender, a second security interest or lien upon any collateral securing this note;

e. if not an individual, is dissolved or is a party to any merger or consolidation or sells or otherwise disposes of all or substantially all of its assets without written consent of the Lender;

f. becomes insolvent or files for protection under any jurisdictional law relating to bankruptcy, debtor relief, or reorganization.

The purchasers were personally liable on the S/S/S note. The S/S/S note was secured by (1) a first security interest in the acquired assets, and (2) an assignment of all the issued and outstanding stock of SPC-FL.

Organization of SPC-FL

SPC-FL was incorporated on August 8, 1990. The total capital investment in SPC-FL was $10,000, consisting of capital stock issued at $1,000 to its shareholders and paid-in capital of $9,000. Following incorporation, SPC-FL was owned by the purchasers (sometimes also referred to as the SPC-FL shareholders) in the following proportions:

| | |
|---|---|
| Patricia M. Spencer | 50% |
| Joseph T. Schroeder | 25% |
| Sheryl S. Schroeder | 20% |
| Lewis E. Smith, Jr. | [1]5% |

[1]Lewis Smith was unrelated to any of the other SPC-FL shareholders. Mr. Smith resigned and sold his 5-percent interest in SPC-FL to Mrs. Schroeder during 1933.

During the years in issue, SPC-FL was a calendar year S corporation within the meaning of section 1361. Mr. Spencer was the chief executive officer and treasurer of SPC-FL, Mr. Schroeder served as its chief operating officer, and Mrs. Spencer, also a corporate officer, worked at SPC-FL as an office clerk.

Nominal Resale of Florida Assets to SPC-FL

During August 1990, the SPC-FL shareholders nominally conveyed the same assets acquired in the Florida transaction to SPC-FL in consideration for $1,150,000. Neither that conveyance nor the consideration for the transaction (hereinafter referred to as the SPC-FL nominal debt) was documented.[16]

Payment Flow

All payments on the $1,150,000 S/S/S note have been made from SPC-FL's current corporate revenues. No payments have been directly made by the SPC-FL shareholders.

SPC-FL began making payments to SSI during September 1990 and continued to do so until October 1991. SPC-FL began experiencing cash-flow problems during 1991, and no payments were

---

[16]    The parties stipulated that the "note" from SPC-FL to the SPC-FL shareholders was never documented. We take this stipulation to mean that the consideration given by SPC-FL to its shareholders took the form of a debt that was never documented by a note.

made for the 3-month period from November 1991 through January 1992.  The S/S/S note was revised during July 1992 when the term for repayment was extended from 10 years to 15 years, and the interest rate was reduced from 10 percent to 8 percent. Following the July 1992 revision, no payments were made during the period from September through December 1992.  During January 1993, the S/S/S note was again revised, and the interest rate was reduced from 8 percent to 6.5 percent.

Information Reported by SPC-FL and the SPC-FL Shareholders

SPC-FL deducted the interest it paid to SSI.  The interest expense deduction ultimately passed through to the individual SPC-FL shareholders.[17]   SPC-FL did not issue Forms 1099 to report interest paid to the SPC-FL shareholders.  On their respective Federal income tax returns, the SPC-FL shareholders did not report any interest income from SPC-FL and did not claim any interest deductions for amounts paid to SSI for taxable years 1990, 1991, or 1992.  On their Federal income tax returns, the Spencers claimed the following losses as Mrs. Spencer's share of losses from SPC-FL:

| Year | Amount of Loss Claimed |
|------|------------------------|
| 1990 | $50,812 |
| 1991 | 33,255 |
| 1992 | 55,800 |

[17]    Mr. Spencer signed all of SPC-FL's Federal income tax returns for the years in issue in the instant case.

On their Federal income tax returns, the Schroeders claimed the following losses as their share of losses from SPC-FL:

### Amount of Loss Claimed

| Year | Joseph T. Schroeder | Sheryl S. Schroeder | Total |
|------|--------------------|--------------------|-------|
| 1991 | $16,628 | $13,302 | $29,930 |
| 1992 | 28,026 | 22,420 | 50,446 |

SPC-FL's corporate returns, Forms 1120S, did not reflect any amount on Schedule L as "loans from shareholders" for taxable years 1990, 1991, or 1992. The debt incurred by SPC-FL in purchasing the assets from the SPC-FL shareholders (i.e., the SPC-FL note) was reflected on Schedule L as "mortgages, notes, and bonds payable in 1 year or more."[18] SPC-FL's Schedules L, for taxable years 1990, 1991, and 1992, reflected that its capital stock was $1,000 and that its paid-in capital was $9,000.

---

[18] The amounts reflected on SPC-FL's Schedules L as "mortgages, notes, and bonds payable in 1 year or more" are as follows:

| Year | Beginning of Tax Year | End of Tax Year |
|------|----------------------|-----------------|
| 1990 | Initial Return | $1,047,927 |
| 1991 | $1,047,927 | 1,053,592 |
| 1992 | 1,053,592 | 1,116,771 |

Attached to SPC-FL's 1990 Form 1120S was Form 8594[19] (Asset Acquisition Statement Under Section 1060). That Form 8594 reports a sale of Class III assets[20] by SSI to SPC-FL in exchange for consideration of $1,150,000 on August 8, 1990. Mr. Spencer signed and reviewed SPC-FL's 1990 Federal income tax return.

Amortization

Upon acquisition of the assets from the SPC-SC shareholders and the SPC-FL shareholders, SPC-SC and SPC-FL, respectively, claimed amortization deductions for the intangible contract rights based on 100 percent of their purchase price. No amounts were allocated to goodwill or other nonamortizable assets. Initially, respondent disallowed the claimed amortization deductions in their entirety. Respondent's adjustment transformed the ordinary losses reported by SPC-SC and SPC-FL

[19] Form 8594 is used to report information concerning the amount of consideration transferred in an "applicable asset acquisition" and its allocation among the assets transferred. Sec. 1.1060-1T(h), Temporary Income Tax Regs., 53 Fed. Reg. 27042 (July 18, 1988). The term "applicable asset acquisition" is defined to mean any transfer (whether directly or indirectly) (1) of assets which constitute a trade or business, and (2) with respect to which the transferee's basis in such assets is determined wholly by reference to the consideration paid for such assets. Sec. 1060(c).

[20] "Class III assets are all assets (other than Class I, II, and IV assets), both tangible and intangible * * * including furniture and fixtures, land, buildings, equipment, accounts receivable, and covenants not to compete." Sec. 1.1060-1T(d)(2)(ii), Temporary Income Tax Regs., 53 Fed. Reg. 27040 (July 18, 1988).

into ordinary income for taxable years 1991 and 1992. Consequently, respondent determined an increase in petitioners' taxable income.

Subsequently, however, the parties agreed that SPC-SC and SPC-FL are entitled to deduct 85 percent of the cost of the intangible termite and pest control contract rights. Accordingly, the parties agreed that the amortizable bases of the intangible contract rights must be reduced by 15 percent (hereinafter referred to as the corrected amortizable basis). The parties further agreed that (1) the termite contracts must be amortized on a straight line basis over a period of 15 years, and (2) the pest control contracts must be amortized on a straight line basis over a period of 10 years.

The parties stipulated that as to the intangible contract rights acquired by SPC-SC on June 1, 1987, the corrected amortizable bases for termite and pest control contracts are $334,406 and $660,136, respectively. The amortization deductions allowed to SPC-SC for all taxable years up to and including 1990 totaled $108,031 for termite contracts, and $324,092 for pest control contracts. The parties further stipulated that the corrected amortizable bases for the termite and pest control contracts acquired by SPC-FL on August 8, 1990, are $112,250 and $824,415, respectively. The amortization allowed to SPC-FL for

all taxable years prior to 1991 aggregated $3,668 for termite contracts and $125,576 for pest control contracts.

The parties stipulated that if this Court adopts petitioners' position, SPC-SC and SPC-FL's allowable amortization deductions for taxable years 1991 and 1992 and for each year thereafter, until the remaining amortizable bases are exhausted, will be as follows:

SPC-SC

Termite contracts:
Corrected amortizable basis                        $334,406
Divided by agreed 15-year useful life         15
  Allowable amortization deduction              22,294

Pest control contracts:
Corrected amortizable basis                        $660,136
Divided by agreed 10-year useful life         10
  Allowable amortization deduction              66,014

SPC-FL

Termite contracts:
Corrected amortizable basis                        $112,250
Divided by agreed 15-year useful life         15
  Allowable amortization deduction               7,483

Pest control contracts:
Corrected amortizable basis                        $824,415
Divided by agreed 10-year useful life         10
  Allowable amortization deduction              82,442

If, however, this Court adopts respondent's position, the parties stipulated that SPC-SC and SPC-FL's allowable amortization deductions for taxable years 1991 and 1992 and for each year thereafter, until the remaining amortizable bases are exhausted, shall be as follows:

SPC-SC

Termite contracts:
| | |
|---|---|
| Corrected amortizable basis | $334,406 |
| Less: previously allowed amortization | (108,031) |
| Adjusted basis | 226,375 |
| Divided by remaining useful life | 11.417 |
| Allowed amortization deduction | 19,828 |

Pest control contracts:
| | |
|---|---|
| Corrected amortizable basis | $660,136 |
| Less: previously allowed amortization | (324,092) |
| Adjusted basis | 336,044 |
| Divided by remaining useful life | 6.417 |
| Allowed amortization deduction | 52,368 |

SPC-FL

Termite contracts:
| | |
|---|---|
| Corrected amortizable basis | $112,250 |
| Less: previously allowed amortization | (3,668) |
| Adjusted basis | 108,582 |
| Divided by remaining useful life | 14.58 |
| Allowed amortization deduction | 7,447 |

Pest control contracts:
| | |
|---|---|
| Corrected amortizable basis | $824,415 |
| Less: previously allowed amortization | (125,576) |
| Adjusted basis | 698,839 |
| Divided by remaining useful life | 9.58 |
| Allowed amortization deduction | 72,948 |

OPINION

In the notice of deficiency, respondent determined that the Spencers were not entitled to take into account in determining their taxable income for taxable years 1990, 1991, and 1992, Mr. Spencer's pro rata share of ordinary loss from SPC-SC for such years because Mr. Spencer's claimed losses exceeded his basis in his stock in SPC-SC and indebtedness owed to him by SPC-SC. Respondent also determined that the Spencers were not entitled to

take into account in determining their taxable income for such years Mrs. Spencer's pro rata share of ordinary loss from SPC-FL, except to the extent of $5,000 for taxable year 1990, because the claimed losses exceeded her basis in her stock in SPC-FL and indebtedness owed to her by SPC-FL.  In the Schroeders' notice of deficiency, respondent determined that they were not entitled to take into account in determining their taxable income for taxable years 1991 and 1992 their pro rata share of ordinary loss from SPC-FL for such years because their claimed losses exceeded their bases in their stock in SPC-FL and indebtedness owed to them by SPC-FL.  Section 1366(a) generally allows shareholders of S corporations to take into account their pro rata share of the corporation's income, losses, and deductions.[21]  Section 1366(d),

---

[21]     Sec. 1366(a) provides, in relevant part, as follows:

(a)   Determination of Shareholder's Tax Liability.--
      (1)  In general.--In determining the tax
      under this chapter of a shareholder for the
      shareholder's taxable year in which the
      taxable year of the S corporation ends * * *,
      there shall be taken into account the
      shareholder's pro rata share of the
      corporation's--
            (A)  items of income (including
            tax-exempt income), loss,
            deduction, or credit the separate
            treatment of which could affect the
            liability for tax of any
            shareholder, and
            (B)  nonseparately computed income
            or loss.

however, limits the aggregate amount of losses and deductions taken into account under section 1366(a) to the sum of (1) the shareholder's adjusted basis in the stock of the corporation, and (2) the shareholder's adjusted basis in any indebtedness owed by the corporation to the shareholder.[22]  It is the second limitation, relating to corporate indebtedness to the shareholders, that is in issue in the instant case.

Neither the Code nor the regulations define the phrase "adjusted basis in any indebtedness owed by the corporation to the shareholder".  Legislative history, however, indicates that

> The amount of net operating loss apportioned to any shareholder * * * is limited under section 1374(c)(2) * * * [predecessor of section 1366(d)(1)(B)[23]] to the adjusted basis of the shareholder's investment in the corporation; that is, to the adjusted basis of the stock in the corporation owned by the shareholder and the adjusted basis of any indebtedness of the corporation to the shareholder.

---

[22]    Sec. 1366(d) provides as follows:

> (d)    Special Rules for Losses and Deductions.--
>        (1)  Cannot exceed shareholder's basis in stock and debt.--The aggregate amount of losses and deductions taken into account by a shareholder under subsection (a) for any taxable year shall not exceed the sum of--
>            (A)  the adjusted basis of the shareholder's stock in the S corporation * * *, and
>            (B)  the shareholder's adjusted basis of any indebtedness of the S corporation to the shareholder * * *.

[23]    Sec. 1374 was superseded upon the addition of sec. 1366 to the Code.  Subchapter S Revision Act of 1982, Pub. L. 97-354, sec. 2, 96 Stat. 1669, 1677.

S. Rept. 1983, 85th Cong., 2d Sess. (1958), 1958-3 C.B. 922, 1141.  We have construed the term "investment", as used in section 1366(d)(1)(B), to mean actual economic outlay of the shareholder in question.  Hitchins v. Commissioner, 103 T.C. 711, 715 (1994); Estate of Leavitt v. Commissioner, 90 T.C. 206, 217 (1988), affd. 875 F.2d 420 (4th Cir. 1989); Perry v. Commissioner, 54 T.C. 1293, 1296 (1970).

Additionally, within the meaning of section 1366(d)(1)(B), a shareholder has basis in a debt owed to him by his corporation only when the debt runs directly from the S corporation to the shareholder.  Prashker v. Commissioner, 59 T.C. 172, 176 (1972); Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968).  In Raynor, we stated:

> No form of indirect borrowing, be it guaranty, surety, accommodation, comaking or otherwise, gives rise to indebtedness from the corporation to the shareholders until and unless the shareholders pay part or all of the obligation.

Id.

Basis Issues

A.    Promissory Notes

Petitioners contend that they have basis, within the meaning of section 1366(d)(1)(B), in the indebtedness incurred by the corporations to them in the transactions through which petitioners acquired assets from SSI and subsequently conveyed such assets to SPC-SC and SPC-FL.  Despite the stipulated form of

the transactions in issue, respondent contends that the substance of the transactions was a sale by SSI of its business assets to two S corporations, SPC-SC and SPC-FL, rather than a sale to petitioners followed by a sale by petitioners to the two S corporations, as petitioners contend.  Specifically, respondent points to following indicators:  (1) The lack of documentation concerning the conveyance from petitioners to SPC-SC and SPC-FL; (2) the lack of direct payments by petitioners to SSI and SCNB; (3) petitioners' failure to report as interest income and claim as interest deductions amounts allegedly paid on their behalf by the S corporation to SSI and SCNB; (4) SSI's failure to enforce against petitioners the acceleration clauses contained in the S/B and S/S/S notes when SPC-SC and SPC-FL suspended payment due to poor cash-flow; and (5) the fact that SPC-SC and SPC-FL reported the debt incurred to acquire the assets on Schedule L as "mortgages, notes, and bonds payable in 1 year or more" rather than as shareholder debt.

Respondent contends that petitioners' only involvement in the transactions was in their capacity as shareholders. Consequently, respondent asserts, because there is no indebtedness running directly from the S corporations to petitioners, petitioners' bases in SPC-SC and SPC-FL do not include the indebtedness owed by the corporations.  Respondent

also argues that petitioners failed to make the requisite economic outlay.

Petitioners contend that the substance of the transactions in issue should be respected in accordance with their stipulated form. Petitioners contend that they acquired assets from SSI and then resold those same assets to SPC-SC and SPC-FL, respectively. Moreover, petitioners assert that the transactions constitute so-called back-to-back sales transactions which, similar to so-called back-to-back loan transactions, entitle them to bases as a result of the S corporations' indebtedness to them.

Petitioners argue that there is a direct obligation between themselves and their respective S corporations and that the SPC-SC and SPC-FL nominal debts, whether regarded as debt or equity, are sufficient to provide bases at least to the extent of the value of the property acquired by the corporations with such debt instruments. Additionally, petitioners contend that because they remain personally liable on the notes given to SSI (i.e., the S/B and S/S/S notes) they made an actual economic outlay. Petitioners argue that it is the alleged direct indebtedness of the S corporations to petitioners that gives rise to bases within the meaning of section 1366(d)(1)(B) rather than some required economic outlay by the shareholders.

Petitioners acknowledge that they failed to follow all of the steps that could have been taken in connection with these

transactions (i.e., executing documentation to reflect the resale of the assets to SPC-SC and SPC-FL, arranging for the S corporations to pay them so that they could in turn pay SSI, and separately reporting items for income tax purposes at the corporate and individual level). They argue that the result would have been a wash and the entries would have offset each other. Furthermore, petitioners contend that, although no conveyancing documents were prepared to reflect the resale of the assets to SPC-SC and SPC-FL, the transactions were evidenced by journal entries on the books of the S corporations.[24] Petitioners argue that none of the deficiencies of which respondent complains negates the form of these transactions, which has been stipulated.

Petitioners rely on Old Colony Trust Co. v. Commissioner, 279 U.S. 716 (1929), for the proposition that payments made on behalf of or at the direction of a creditor to a third party are the same as payments to the creditor and repayment over by the creditor to the third party. In the same vein, petitioners contend that they reported no interest income and claimed no interest expense for amounts allegedly paid on their behalf by the S corporations to SSI and SCNB because such income and

---

[24]   SPC-SC and SPC-FL each recorded the transaction as a debit to assets and a credit to notes payable--seller.

expense would have offset each other on their Federal income tax returns.

Generally, we treat stipulations as conclusive admissions by the parties, and we do not permit a party to change or contradict a stipulation, except in extraordinary circumstances. Rule 91(e); Jasionowski v. Commissioner, 66 T.C. 312, 318 (1976). We find no extraordinary circumstances present in the instant case to cause us to disregard the parties' stipulation concerning the form of the transactions in issue. Substance, however, is not established by mere proof of form. Wichita Terminal Elevator Co. v. Commissioner, 6 T.C. 1158, 1164 (1946), affd. 162 F.2d 513 (10th Cir. 1947). The Government is not bound by the form chosen and may recharacterize the nature of the transaction according to its substance while overlooking the form selected by the taxpayer. Don E. Williams Co. v. Commissioner, 429 U.S. 569, 579-580 (1977); Higgins v. Smith, 308 U.S. 473, 477 (1940). Although the parties stipulated the form of the transactions in issue (i.e., that petitioners purchased assets from SSI and then later conveyed those same assets to SPC-SC and SPC-FL), respondent did not stipulate that the form of the transaction matched its substance. Accordingly, we conclude that respondent's stipulation does not prevent respondent from arguing that the substance of the transaction prevails over its form.

Many of the stipulated facts evince petitioners' failure to respect the form of the transactions they advocate.

Significantly, neither the sale from petitioners to SPC-SC, nor the sale from petitioners to SPC-FL, was documented apart from the journal entries. The record is devoid of any documentary evidence of an indebtedness (i.e., a written note or other similar instrument) running directly from SPC-SC or SPC-FL to petitioners. The assets acquired from SSI were, in effect, simultaneously transferred to the ultimate users, SPC-SC and SPC-FL, and the S corporations paid the entire consideration for such assets from their own current operating revenues directly to SSI. Petitioners reported no interest income and claimed no interest expense for the amounts allegedly paid on their behalf by SPC-SC and SPC-FL to SSI or SCNB.

Moreover when SPC-SC and SPC-FL missed payments to SSI due to poor cash-flow, SSI elected not to enforce the acceleration clause in the S/B and S/S/S notes against petitioners. Rather, SSI revised the terms of the notes and never called on petitioners to pay. From such evidence we infer that SSI did not look to petitioners to pay the indebtedness--rather, SSI looked to the ultimate owners of the business and assets for payment; i.e., SPC-SC and SPC-FL. Consequently, petitioners' role in the transactions was, at best, indirect.[25]

---

[25] Furthermore, with respect to the SPC-FL transaction, the record contains additional evidence that in substance SSI sold its Florida operating assets directly to SPC-FL. Form 8594, filed with SPC-FL's 1990 Form 1120S, indicates that the assets in

(continued...)

Petitioners argue that we should respect the form of the transactions as stipulated, yet they themselves failed to respect the form that they advocate. While no single factor is conclusive, we believe that the defects in form that we have discussed above, when viewed as a whole, demonstrate that the substance of the transactions in issue was that SSI sold its business and operating assets to SPC-SC and SPC-FL. Petitioners rely on Gilday v. Commissioner, T.C. Memo. 1982-242, n.8, for the proposition that courts have been lenient to taxpayers who did not take all of the steps in a transaction when to do so would result in the utilization of fruitless steps. We think petitioners' reliance on Gilday is misplaced because the defects in form that we have discussed above are not merely "fruitless steps". Generally, a transaction is to be given its tax effect in accord with what actually occurred and not in accord with what might have occurred. Don E. Williams Co. v. Commissioner, supra at 579-580. Mr. Spencer testified that he was advised by his certified public accountant as to how to arrange the transactions

---

[25](...continued)
question were sold by SSI to SPC-FL for a consideration of $1,150,000. We note that in his testimony at trial, Mr. Spencer disputed the accuracy of the documentation concerning the Florida transaction. Mr. Spencer asserts that he had no knowledge of the Form 8594 filed with SPC-FL's 1990 Form 1120S. Mr. Spencer further insists that the Form erroneously discloses SPC-FL as the purchaser of the assets in question. We do not rely solely on the Form 8594 in reaching our conclusion that in substance SSI sold its business and assets to SPC-SC and SPC-FL.

in order to have basis in the corporate indebtedness.  Mr.
Spencer further testified that he was "very familiar with what
the documents needed to say."  In light of such advice and
knowledge, we find it significant that Mr. Spencer did not follow
through with all of the necessary steps.  Based on our thorough
review of the evidence contained in the record, we conclude that,
in substance, SSI sold certain operating assets directly (1) to
SPC-SC, in exchange for $270,000, in cash and a $900,000
promissory note,[26] and (2) to SPC-FL, in exchange for a
$1,150,000 promissory note.  Accordingly, we find that there is
no direct indebtedness between the S corporations and
petitioners.[27]  It follows that payment by SPC-SC and SPC-FL to
SSI and SCNB was not on petitioners' behalf.

---

[26]    Consideration for the assets consisted of $270,000 in cash
plus a $900,000 promissory note, for a total purchase price of
$1,170,000.  SPC-SC borrowed $250,000 of the cash paid at closing
from SCNB.  The source of the remaining $20,000 is not clear.
Thus, at the very least, SPC-SC paid $1,150,000 ($1,170,000 less
$20,000) in exchange for the SSI's South Carolina operating
assets.

[27]    As we find no direct indebtedness, we need not reach the
question of whether there was the requisite "economic outlay".
See Estate of Leavitt v. Commissioner, 90 T.C. 206, 217 (1988),
affd. 875 F.2d 420 (4th Cir. 1989); Prashker v. Commissioner, 59
T.C. 172 (1972); Raynor v. Commissioner, 50 T.C. 762, 770-771
(1968).  Furthermore, because of our finding with respect to the
substance of the transactions in issue, we need not consider
petitioners' contentions concerning the consequences of the so-
called back-to-back sales transactions.  Petitioners' position
regarding the so-called back-to-back sales transaction is
dependent on a finding that the substance of these transactions
is equivalent to the stipulated form--an argument that we
considered and rejected.

B.    SCNB Bank Loan to SPC-SC

We next consider whether, due to Mr. Spencer's guaranty of the bank loan made by SCNB directly to SPC-SC, he had any basis in the bank loan, within the meaning of section 1366(d), that would allow him to take into account his pro rata share of SPC-SC's losses in determining his taxable income.

This court has held that mere shareholder guaranties of S corporation indebtedness generally fail to satisfy the requirements of section 1366(d)(1)(B) (i.e., economic outlay plus a direct indebtedness between the corporation and its shareholders).  Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420, 422 (4th Cir. 1989); Raynor v. Commissioner, 50 T.C. 762, 770-771 (1968); Brown v. Commissioner, T.C. Memo. 1981-608, affd. 706 F.2d 755 (6th Cir. 1983).  No form of indirect borrowing, including a guaranty, gives rise to indebtedness from the corporation to the shareholders for such purpose until and unless the shareholders pay part or all of the obligation.  Raynor v. Commissioner, supra at 770-771; see also Perry v. Commissioner, 47 T.C. 159, 164 (1966), affd. 392 F.2d 458 (8th Cir. 1968) (there is nothing in the statutory wording, nor the regulations, nor the committee reports which warrants an inference that a shareholder's contract of guaranty with corporate creditors is tantamount to an indebtedness of the corporation to the shareholder).  Prior to that crucial act,

liability may exist, but not debt to the shareholder. Raynor v. Commissioner, supra at 771. This Court also has held that the mere guaranty of a loan does not involve any economic outlay. Estate of Leavitt v. Commissioner, supra at 422; Brown v. Commissioner, supra. Until the guarantor pays the obligation, the guarantor does not have an actual investment. Brown v. Commissioner, supra; Underwood v. Commissioner, 63 T.C. 468, 476 (1975), affd. 535 F.2d 309 (5th Cir. 1976).

Nonetheless, in Selfe v. United States, 778 F.2d 769, 773 (11th Cir. 1985), the Court of Appeals for the Eleventh Circuit[28] concluded that a shareholder has basis in guaranteed loans for purposes of section 1366(d)(1) where the facts demonstrate that, in substance, the shareholder borrowed the funds and subsequently advanced them to the S corporation. In Selfe, the court reasoned that the shareholder-guaranteed loan may be treated for tax purposes as an equity investment in the corporation where the lender looks to the shareholder as the primary obligor. Id. at 774. Thus, pursuant to Selfe, shareholder guaranteed loans may give rise to basis in the shareholder's stock as an equity investment within the meaning of section 1366(d)(1)(A). The taxpayer in Selfe entered the retail clothing business. Prior to

---

[28] Absent stipulation to the contrary, the instant case is appealable to the Court of Appeals for the Eleventh Circuit. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

incorporation of that business, the taxpayer pledged stock in a family-owned corporation, Avondale Mills, in exchange for a line of credit to be used in the business.  Subsequently, the clothing business was incorporated as Jane Simon, Inc.  At the request of the bank, all loans made to the taxpayer individually, with the exception of $10,000, were converted to corporate loans (to Jane Simon, Inc.).  The taxpayer guaranteed all such indebtedness to the bank.  At trial, the loan officer employed by the bank testified that the bank wanted the assurance of having the corporation primarily liable for repayment of the loan, but that the conversion did not abridge the stock pledged as collateral, or the bank's rights against the taxpayer as guarantor, in the event of the corporation's default.  Subsequently, the corporation (Jane Simon, Inc.) granted the bank a security interest in its receivables, inventory, and contract rights in order to obtain renewal of its loans.

Relying on Selfe v. United States, supra, petitioners argue that the bank loan was, in substance, a loan to Messrs. Spencer and Boozer and a subsequent capital contribution of such loan proceeds to SPC-SC.

There are, however, fundamental differences between the instant case and Selfe.  The corporate indebtedness in Selfe was preceded by a loan to the shareholder in her individual capacity. That loan was subsequently converted to a corporate loan, upon

formation of the S corporation. Unlike Selfe, the bank loan in issue in the instant case was made directly to the S corporation. Mr. Spencer therefore was never primarily liable for repayment of the bank loan.

Additionally, although in both Selfe and the instant case each of the corporations granted security interests in its own assets as collateral for the bank loans, the circumstances surrounding each pledge of assets are very different. In Selfe, the corporation granted a security interest in its receivables, inventory, and contract rights in order to secure renewal of the original loans. In the instant case, however, SPC-SC granted a security interest in the assets acquired from SSI in order to secure the initial loan, suggesting that, from the very beginning, SCNB was looking to the operating assets of SPC-SC for generation of the revenues necessary to support the loan payments.

Furthermore, unlike the taxpayer in Selfe, Mr. Spencer failed to produce testimony from a bank representative concerning the circumstances and expectations surrounding the bank loan. No one from SCNB was called to testify that SCNB looked primarily to the SPC-SC shareholders, Messrs. Spencer and Boozer, for repayment of the bank loan. The only evidence that the bank looked primarily to Messrs. Spencer and Boozer for repayment was Mr. Spencer's own opinion to that effect. Petitioners contend

that Mr. Spencer's testimony is corroborated by the fact that he and Mr. Boozer pledged additional assets, personally owned by them, as security for the bank loan. Petitioners maintain that the pledge of such additional assets goes beyond a mere guaranty of a corporate debt and shows SCNB's intent to look primarily at them for repayment.

The record in the instant case does not persuade us that SCNB primarily looked to the individuals for repayment. It is not surprising that a lender of a loan to a small, closely held, corporation such as SPC-SC would seek the personal guaranty of the corporation's shareholders. Harris v. United States, 902 F.2d 439, 445 (5th Cir. 1990). It is also not unusual that a lender would require such shareholders to pledge collateral as security for the guaranty. Moreover, Mr. Spencer testified that SCNB "obviously was looking at the operating assets of the company that were producing the revenue in order to provide the proceeds or the funds to make the [bank loan] payments," which testimony directly contradicts his contention that the bank looked primarily to him and Mr. Boozer for repayment of the bank loan.

Contrary to Mr. Spencer's testimony, the record contains ample evidence that SCNB primarily looked to SPC-SC for repayment of the loan. SCNB made the bank loan directly to SPC-SC, which repaid the bank loan from its current corporate revenues; Mr.

Spencer never paid anything.  Rather than accounting for the

$250,000 bank loan as a capital contribution or loan by the

shareholders, SPC-SC's Schedules L for the years in issue

reflected that its capital stock was only the SPC-SC

shareholder's $1,000 initial capital contribution and that its

paid-in capital was zero.  There is no indication that

petitioners treated the bank loan as a personal loan by reporting

SPC-SC's interest payments to SCNB as constructive dividend

income.  Moreover, petitioners claimed no interest deductions for

amounts paid by SPC-SC to SCNB.  Petitioners were not free to use

the funds as they chose--SCNB directed that the proceeds be paid

directly to SSI.  Accordingly, we conclude that SCNB primarily

looked to SPC-SC for repayment of the bank loan.  Consequently,

petitioners' reliance on Selfe v. United States, 778 F.2d 769

(11th Cir. 1985), is of no avail.

We have considered the parties' remaining arguments

regarding the basis issues for purposes of section 1366(d) and

conclude that they are either without merit or unnecessary to

reach in light of our holdings above.

Amortization Issue

Upon purchase of the assets, SPC-SC and SPC-FL erroneously

amortized the cost of the acquired intangible contract rights

based on 100 percent of the cost of such contracts.  The parties

now agree that the original amortizable bases of the acquired

contract rights must be reduced by 15 percent because only 85 percent of the cost of such contract rights is properly amortizable. Additionally, the parties agree that the allowable amortization deduction for the acquired contract rights must be adjusted in light of the 15-percent reduction to the original amortizable bases. The parties do not agree, however, as to the method for calculating the allowable amortization deduction for taxable years subsequent to 1990.[29]

Section 167(a) generally allows as a depreciation deduction a reasonable allowance for the exhaustion, and wear and tear (including a reasonable allowance for obsolescence) of property either used in a trade or business or held for the production of income. Intangible assets may be depreciated where it is known from experience or other factors that the assets will be of use in the business or in the production of income for only a limited period, the length of which can be estimated with reasonable accuracy.[30] Sec. 1.167(a)-3, Income Tax Regs.

---

[29] The parties seek a decision regarding allowable amortization for taxable years subsequent to 1990. Our decision with respect to the amortization allowance, however, is limited to the taxable years in issue in the instant case.

[30] Sec. 197, which relates to the amortization of certain acquired intangible assets, was added to the Code by the Omnibus Budget Reconciliation Act of 1993 (OBRA-93), and applies to property acquired after Aug. 10, 1993 (the date of enactment). OBRA-93, Pub. L. 103-66, sec. 13261 (a), (g), 107 Stat. 312, 532, 540. Sec. 197 does not apply to the assets in issue in the instant case because they were acquired prior to the date of

(continued...)

The parties agree that the acquired contract rights must be amortized using the straight line method.[31]    Under

---

[30](...continued)
enactment.

[31]    Numerous obsolete provisions in sec. 167 were eliminated by the Omnibus Budget Reconciliation Act of 1990 (OBRA-90), effective for property placed into service after Nov. 5, 1990 (the effective date).  OBRA-90, Pub. L. 101-508, sec. 11812(a), 104 Stat. 1388, 1388-534.  Specifically, sec. 167(b) was rewritten and sec. 167(c) was stricken.  OBRA-90, sec. 11812(a). The legislative history, however, indicates that such changes were "not intended to change in any respect the present-law rules relating to the allowable methods of depreciation."  H. Rept. 101-894, at 36 (1990).  Pre-OBRA-90, sec. 167(b) and (c) provides the allowable method of depreciation for the assets in issue in the instant case because they were placed into service prior to the effective date of the amendments made by OBRA-90.
    Prior to OBRA-90, pursuant to sec. 167(b) and 167(c), the cost of intangible property was recovered using the straight line method of depreciation.  Former sec. 167(b) and (c) read as follows:

> (b)  Use of Certain Methods and Rates.--For taxable years ending after December 31, 1953, the term "reasonable allowance" as used in * * * [section 167(a)] shall include (but shall not be limited to) an allowance computed in accordance with regulations prescribed by the Secretary, under any of the following methods:
>
> (1) the straight line method,
>
> (2) the declining balance method, using a rate not exceeding twice the rate which would have been used had the annual allowance been computed under the method described in paragraph (1),
>
> (3) the sum of the years-digits method, and
>
> (4) any other consistent method productive of an annual allowance which, when added to all allowances for the period commencing with the taxpayer's use of the property and including

(continued...)

the straight line method, the cost or other basis of the property less its estimated salvage value is deductible in equal annual amounts over the period of the estimated useful life of the property.  Sec. 1.167(b)-1(a), Income Tax Regs.  The allowance for depreciation (amortization in the case of intangible assets) for the taxable year is calculated by dividing (1) the adjusted basis of the property at the beginning of the taxable year, less salvage value, by (2) the remaining useful life of the property at such time.  Id.

Accordingly, under the straight line method, three elements are necessary in order to properly compute a reasonable allowance for amortization:  (1) The adjusted basis of the property, discussed infra; (2) the estimated remaining useful life; and (3)

_____

[31](...continued)
>       the taxable year, does not, during the first
>       two- thirds of the useful life of the
>       property, exceed the total of such allowances
>       which would have been used had such
>       allowances been computed under the method
>       described in paragraph (2).

>       (c)  Limitations on Use of Certain Methods and Rates.--
>       Paragraphs (2), (3), and (4) of * * * [section 167(b)]
>       shall apply only in the case of property (other than
>       intangible property) described in * * * [section
>       167(a)] with a useful life of 3 years or more * * *
>       [Emphasis added.]

Thus, prior to OBRA-90, sec. 167(c) rendered the accelerated amortization methods provided in sec. 167(b) inapplicable to intangible assets, leaving only the straight line method.

the estimated salvage value as of the end of the useful life.

There is no salvage value for the acquired contract rights, and

the parties have stipulated the estimated useful life to be 15

years for termite contracts and 10 years for pest control

contracts.  Accordingly, the only element remaining to be decided

in the instant case is the proper adjusted bases of the acquired

contract rights for purposes of amortization.

The basis on which amortization is to be allowed is defined

as the adjusted basis provided in section 1011 for determining

the gain on the sale or other disposition of the property.  Sec.

167(g).[32]  Pursuant to section 1011(a), the adjusted basis for

determining the gain or loss from the sale or other disposition

of property is the cost of the property determined under section

1012 (with certain exceptions not material here) adjusted as

provided in section 1016.  Section 1016(a)(2) provides, in

effect, that the basis of the property shall be adjusted by the

amount of any amortization previously allowed, but not less than

the amount allowable, with respect to the property.  Amortization

"allowed" is the amount actually deducted by the taxpayer and not

challenged by the Commissioner.  Virginian Hotel Corp. v.

Helvering, 319 U.S. 523, 527 (1943).  Consequently, the greater

of the amount allowed or allowable in a prior tax year reduces

---

[32]    Sec. 167(g) was redesignated as sec. 167(c) by OBRA-90, Pub.
L. 101-508, sec. 11812(a)(1), 104 Stat. 1388, 1388-534.

the basis in the amortizable asset which, in turn, reduces the amount available for amortization in subsequent years.  See, e.g., Kilgroe v. United States, 664 F.2d 1168, 1170 (10th Cir. 1981).

Respondent, citing Kilgroe v. United States, supra, contends that the correct amortization deduction allowable to SPC-SC and SPC-FL for taxable years after 1990 should be calculated by apportioning the corrected amortizable bases of the properties, as reduced by amortization allowed prior to taxable year 1991, over the properties' remaining useful life.

Petitioners, however, assert that the correct annual amortization allowable to SPC-SC and SPC-FL should be calculated by apportioning the corrected amortizable bases of the properties without regard to amortization allowed prior to 1991, over the agreed useful life (i.e., 15 years for termite contracts and 10 years for pest control contracts), until the remaining amortizable bases are exhausted.  Citing Fribourg Navigation Co. v. Commissioner, 383 U.S. 272 (1966), and section 1.167(a)-1(b) and (c), Income Tax Regs., petitioners maintain that the original annual straight line amortization allowance may be changed prospectively only when there has been a change in either the estimated useful life or the salvage value of the property in

question.[33]   Petitioners further contend that respondent's

method of calculating the allowable amortization deduction

contravenes the "annual accounting concept" as defined in Burnet

v. Sanford & Brooks Co., 282 U.S. 359 (1931).  Petitioners

maintain that respondent's method would, in effect, gradually

recapture the excessive depreciation from closed years by

offsetting it against future depreciation deductions over the

remaining lives of the affected contracts, thereby disregarding

the statute of limitations.  Petitioners cite Newark Morning

Ledger v. United States, 507 U.S. 546 (1993), for the proposition

that the primary purpose of an annual amortization deduction is

"to further the integrity of periodic income statements by making

a meaningful allocation of the cost entailed in the use

---

[33]   Sec. 1.167(a)-1(b) and (c), Income Tax Regs., provides, in
relevant part, as follows:

   (b)  The estimated remaining useful life may be subject to
   modification by reason of conditions known to exist at
   the end of the taxable year and shall be redetermined
   when necessary regardless of the method of computing
   depreciation.  However, estimated remaining useful life
   shall be redetermined only when the change in the
   useful life is significant and there is a clear and
   convincing basis for the redetermination.  * * *

   (c)  Salvage value shall not be changed at any time
   after the determination made at the time of acquisition
   merely because of changes in price levels.  However, if
   there is a redetermination of useful life under the
   rules of * * * [sec. 1.167(a)-1(b)], salvage value may
   be redetermined based upon facts known at the time of
   such redetermination of useful life.  * * *

(excluding maintenance expense) of the asset to the periods to which it contributes."  Id. at 553 (quoting Massey Motors, Inc. v. United States, 364 U.S. 92, 104 (1960).  Petitioners argue that, where, as in the instant case, there has been no change to the useful life or salvage value (zero in the instant case), basing the annual amortization allowance to be deducted (until the amortizable basis of the asset has been exhausted) on the correctly determined original amortizable bases of the assets would more accurately reflect the annual year concept.

The parties have agreed that the amortizable bases of the acquired contract rights should be reduced by 15 percent, in effect reallocating the purchase price among amortizable and nonamortizable assets.  This reallocation, and the resulting corrected amortizable bases, is similar to a purchase price reduction that will affect the calculation of the amount of amortization to be deducted in subsequent taxable years.  See, e.g., Inter-City Television Film Corp. v. Commissioner, 43 T.C. 270, 286 (1964).  To calculate the bases for amortization for the years in issue, section 1016(a)(2) requires that the corrected amortizable bases be further reduced by the greater of amortization allowed or allowable.  Computing & Software Inc. v. Commissioner, 65 T.C. 1153, 1154 (1976).

Petitioners do not deny that the adjusted bases of the acquired contract rights must be reduced by the greater of

amortization allowed or allowable.  Rather, they dispute respondent's contention that the annual amortization deduction (as opposed to the bases of the assets in question) should be calculated on the adjusted bases as corrected.  What petitioners fail to recognize, however, is that it is the adjusted bases of the assets in question on which the annual amortization deduction is calculated.  The statutory language is clear:  Only the adjusted basis of property at the beginning of any taxable year is subject to depreciation in that year.  Secs. 167(g), 1011(a), 1016.  Not only is respondent's reduction of the intangible contracts' corrected amortizable bases by the greater of amortization allowed or allowable in accord with sections 167(g), 1011(a), and 1016(a)(2), but it fully complies with the straight line method as defined in section 1.167(b)-1(a), Income Tax Regs., under which the allowance for amortization is computed annually based on the adjusted basis of property at the beginning of the taxable year.[34]

Moreover, we find Kilgroe v. United States, 664 F.2d 1168 (10th Cir. 1981) instructive as to the proper method for calculating amortization for subsequent years where allowed amortization was excessive in prior years.  In Kilgroe, the taxpayer took depreciation deductions for certain buildings

---

[34]    We note that petitioners do not challenge the validity of sec. 1.167(b)-1(a), Income Tax Regs.

constructed at a cost of $578,030 based on a 3-year useful life. Subsequently, the Internal Revenue Service disallowed part of the taxpayer's depreciation deductions claiming that the buildings had either (1) a useful life of 40 years with no salvage value, or (2) a useful life of 3 years with a salvage value of $389,375. The District Court subsequently determined that the buildings had a useful life of 10 years with no salvage value.  The parties could not agree on the proper method of computing the allowable depreciation deduction for the 10-year period.  The Court of Appeals for the Tenth Circuit set forth the appropriate procedure for determining subsequent allowable depreciation when assets have previously been excessively depreciated as follows:

> If at any time before property is discarded it develops that its useful life has been inaccurately estimated, depreciation should not be modified for prior years, but the remainder of the cost, or other basis not already provided for through a depreciation reserve or deducted from book value, should be spread ratably over the estimated remaining life of the property, and depreciation deductions taken accordingly.

Id. at 1170; see also Cohn v. United States, 259 F.2d 371, 377-378 (6th Cir. 1958) (upon redetermination of the useful life, depreciation is not modified for prior years, but the remaining depreciated cost is spread ratably over the new estimated remaining useful life and depreciation deductions taken accordingly for the current and succeeding years).  We conclude that the same logic should apply where a property's basis for amortization is redetermined.

Furthermore, we disagree with petitioners' contention that no change can be made to the annual amortization allowance absent a change to the estimated useful life or salvage value of the property. Under the straight line method of computing amortization, the amortization allowance is calculated annually based on three independent factors (i.e., the adjusted basis of the property at the beginning of the taxable year, the salvage value of the property, and the remaining useful life of the property at such time). Sec. 1.167(b)-1(a), Income Tax Regs. "The reasonableness of any claim for depreciation * * * [amortization in the case of intangible assets] is to be determined upon the basis of conditions known to exist at the end of the period for which the return is made." Sec. 1.167(b)-0(a), Income Tax Regs. The annual straight line depreciation allowance, therefore, is a fluid calculation from year to year using estimates. Accordingly, where there is an adjustment to any one of the three factors used in the straight line method, whether it be the adjusted basis, estimated useful life, or salvage value, the annual straight line amortization allowance must change as well. Consequently, we reject petitioners' contention that Kilgroe v. United States, supra, is distinguishable because it did not consider the preeminence of the annual accounting concept in calculating depreciation deductions for open years where there has been no change in the

estimated useful life or salvage value, but there have been
excessive depreciation deductions allowed for taxable years now
closed.

Additionally, the regulation cited by petitioners, section
1.167(a)-1(b) and (c), Income Tax Regs., is inapposite to our
decision because neither the estimated useful life nor the
salvage value of the contract rights is in issue.  Furthermore,
neither regulation contemplates the effect on the annual
amortization allowance where there has been an adjustment to the
original amortizable basis.

Petitioners' reliance on Fribourg Navigation Co. v.
Commissioner, 383 U.S. 272 (1966), is misplaced.  The Court in
Fribourg considered whether the taxpayer was entitled to a
depreciation deduction in the year of an unanticipated sale of an
asset, prior to the end of its useful life, at a price exceeding
its adjusted basis.  In Fribourg, unforeseen circumstances
created an acute shortage of cargo ships, and the taxpayer was
able to sell his ship at a substantial gain.  The Commissioner
disallowed the depreciation deduction for the year of the sale,
on the ground that the tremendous appreciation in value of the
ship was inconsistent with any allowance for depreciation.  In
holding that the depreciation was allowable, the Supreme Court
noted that depreciation of assets and the gain on the sale of
assets are distinct concepts, and that such an unanticipated

increase in value should have no impact on depreciation, provided that the original determination was reasonable.  Id. at 276-278.

Fribourg did not contemplate the effect of an adjustment to the original depreciable basis on the annual straight line depreciation allowance.  Additionally, Fribourg did not consider whether the adjusted depreciable basis should be further adjusted by previously allowed depreciation in order to arrive at the proper remaining basis for depreciation.  Rather, Fribourg addressed the impact of fluctuations in the market value subsequent to the original determination of salvage value.

We conclude that respondent's method of calculating the allowable amortization deduction would neither contravene the annual accounting concept nor disregard the statute of limitations.  Federal income taxes are generally assessed on the basis of annual returns showing the net result of all the taxpayer's transactions during a fixed accounting period.  Burnet v. Sanford & Brooks Co., 282 U.S. at 363.  Although each year stands separately, and an error made in computation of the tax for one year cannot be corrected by making an erroneous computation under the law of a later year, Greene Motor Co. v. Commissioner, 5 T.C. 314, 316 (1945); MacMillan Co. v. Commissioner, 4 B.T.A. 251, 253 (1926), the annual accounting concept does not require us to close our eyes to what happened in prior years, United States v. Skelly Oil Co., 394 U.S. 678, 684

(1969).  Keeping track of prior years' events is especially necessary where, as in the instant case, the computation involves the allowance for amortization.

The annual amortization deduction calculation depends on amortization allowed or allowable in prior years, and is subject to change in subsequent years if any one of the three factors on which it is based is redetermined.  Moreover, the reasonableness of an allowance for amortization is to be determined in light of conditions known to exist at the end of the period for which the return is made.  Sec. 1.167(b)-0(a), Income Tax Regs.  The depreciation regulations, therefore, contemplate that the allowance may change as conditions change.

The result we reach does no violence to the annual accounting system.  Furthermore, respondent's method does not disregard the statute of limitations as it does not seek to modify amortization for prior years.

We conclude that when the original amortizable basis is redetermined, as in the instant case, the unrecovered cost, as reduced by the greater of amortization previously allowed or allowable, less salvage value (if any) should be spread over the remaining useful life to arrive at the correct annual amortization allowance for subsequent years.

We have considered the remaining arguments of the parties and find them either without merit or unnecessary to reach.

Decisions will be entered under Rule 155.