T.C. Memo. 2000-380


UNITED STATES TAX COURT


FRANKLIN W. BRIGGS, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

JIMMY D. MORRIS AND SANDRA B. MORRIS, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket Nos. 5412-98, 5413-98.      Filed December 18, 2000.


Graydon W. Florence, Jr., for petitioners.

Mark S. Mesler and Pamela L. Mable, for respondent.


MEMORANDUM OPINION

THORNTON, Judge:  These cases were consolidated for trial, briefing, and opinion.  Respondent determined the following deficiencies, additions to tax, and penalties with respect to petitioners' Federal income taxes:

### Franklin W. Briggs

| | | Penalties and Additions To Tax | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b)(1) | 6661 |
|------|------------|------------|---------------|---------------|------------|------|
| 1986 | $69,077 | $2,927 | $37,536 | ** | -- | $17,269 |
| 1987 | 10,875 | (2,109)* | 20,540 | *** | $18,000 | 4,828 |
| 1988 | 20,490 | -- | -- | -- | -- | 5,123 |

   * The record does not conclusively establish the source of what is apparently a penalty refund.
  ** 50 percent of the interest due on $50,048.
 *** 50 percent of the interest due on $7,935.

### Jimmy D. Morris and Sandra B. Morris

| | | Penalties and Additions to Tax | | | | |
| | | Sec. | Sec. | Sec. | Sec. | Sec. |
| Year | Deficiency | 6651(a)(1) | 6653(b)(1)(A) | 6653(b)(1)(B) | 6653(b)(1) | 6661 |
|------|------------|------------|---------------|---------------|------------|------|
| 1986 | $77,278 | $6,928 | $37,175 | ** | -- | $19,320 |
| 1987 | (1,048)* | 4,489 | 26,613 | *** | -- | 13,173 |
| 1988 | 2,606 | -- | -- | -- | $1,955 | -- |

   * The negative adjustment resulted from a net operating loss carryback from 1990.
  ** 50 percent of the interest due on $43,838.
 *** 50 percent of the interest due on $8,207.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

After concessions,[1] the issues for decision are:

1. The amount of ordinary income petitioners realized with respect to certain gas rebate checks earned by their wholly owned S corporation but received by petitioners individually;

---

[1] The parties have stipulated various adjustments to petitioners' reported income. In addition, on brief petitioners concede that for taxable year 1988 petitioners Franklin Briggs (Briggs) and Jimmy Morris (Mr. Morris) each have additional income of $36,000 from the proceeds of the sale of Association Cable TV, Inc.'s (ACT's) assets and of $40,200 from proceeds from a covenant not to compete.

2. whether petitioners' bases in their wholly owned S corporation include loans made directly to the S corporation by an unrelated lender;

3. whether gains that petitioners realized from certain 1986 land sales represent capital gains or ordinary income;

4. whether petitioners are entitled to net operating loss carryback deductions for 1987 arising from liabilities that their wholly owned S corporation incurred to a bank with respect to the bank's payments to a third party pursuant to a letter of credit between the bank and the S corporation;

5. whether petitioners are liable for additions to tax pursuant to section 6651(a)(1) for failure to file timely income tax returns for taxable years 1986 and 1987;

6. whether petitioners are liable for additions to tax for fraud pursuant to section 6653(b) for taxable years 1986, 1987, and 1988;

7. whether Jimmy and Sandra Morris (the Morrises) are liable for additions to tax pursuant to section 6661 for taxable years 1986 and 1987; and

8. whether Franklin Briggs (Briggs) is liable for additions to tax pursuant to section 6661 for taxable years 1986, 1987, and 1988.

For purposes of order and clarity, after a brief description of general background, each of the issues submitted

for our consideration is set forth below with separate background and discussion.

## General Background

The parties have stipulated some of the facts. When the petitions were filed, Briggs resided in Alford, Florida, and the Morrises were married and resided in Panama City, Florida.

In 1982, Briggs and the Morrises started a multi-million-dollar real estate construction business known as the Towers Group. The Towers Group ultimately comprised nine corporations, with activities ranging from real estate management to town house construction and sales. Two of the Towers Group corporations were: (1) Towers Construction Co. of Panama City, Inc. (Towers Construction), which was in the construction business and eventually constructed town house units in a Panama City Beach, Florida, project known as the Gulf Highlands Beach Resort (Gulf Highlands); and (2) Towers Development Co. of Panama City, Inc. (Towers Development), which was in the development business and eventually developed the Gulf Highlands project.

For the years in issue, Sandra Morris (Mrs. Morris) and Briggs each owned 50 percent of the stock of Towers Construction and Towers Development.[2] Briggs was president of Towers Construction and Towers Development for the years in issue.

---

[2] Mr. Morris was not a shareholder of any of the corporations in the Towers Group, having placed all his interests in his wife's name to avoid his creditors.

For Federal income tax purposes, Towers Construction elected on June 1, 1983, to be treated as an S corporation as defined by section 1361(a)(1). Towers Development made its S corporation election on January 1, 1984.

## Issue 1. Gas Rebate Payments

Background

In 1985, West Florida Natural Gas, Inc., of Panama City, Florida (West Florida Gas), began participating in an energy conservation program, authorized by the State of Florida, to encourage the use of natural gas instead of electricity. Under the program, contractors who installed gas heating and cooling units were eligible to receive rebates from gas companies.

Beginning in 1985, Towers Construction participated in the West Florida Gas rebate program. Towers Construction, as the contractor on the Gulf Highlands project, was entitled to receive the gas rebate checks from West Florida Gas. In 1985, Towers Construction received from West Florida Gas six rebate checks totaling $112,000, and in January 1986, it received two more rebate checks totaling $22,620. Beginning in May 1986, and continuing through November 1988, with respect to gas rebates

earned by Towers Construction, West Florida Gas issued rebate checks listing the payee as either Briggs or Jimmy Morris (Mr. Morris).[3]

Each rebate check that was issued after 1985, with one exception, was either cashed by one of the petitioners or deposited in one of their personal banking accounts.[4]  Attached as the appendix is a schedule detailing the West Florida Gas rebate payments received by Briggs and the Morrises.  The total rebate payments were as follows:

| Year | Briggs | The Morrises |
|---|---|---|
| 1986 | $50,677.50 | $38,497.50 |
| 1987 | 14,355.00 | 21,315.00 |
| 1988 | 43,500.00 | 38,280.00 |
| Total | 108,532.50 | 98,092.50 |

On their Federal income tax returns, as originally filed, neither petitioners nor Towers Construction reported as income the West Florida Gas rebate checks that had been issued in the individual name of either Briggs or Mr. Morris.  On October 20, 1994, Briggs and Mr. Morris were each convicted by the U.S.

---

[3] William Webb (Webb), an employee of West Florida Natural Gas, Inc. (West Florida Gas), handled the part of the rebate program in which Towers Construction Co. of Panama City, Inc. (Towers Construction), was participating.  Webb, now deceased, was Mr. Morris' first cousin.  In 1987 and 1988, Webb embezzled between $20,000 and $100,000 from West Florida Gas.  In July 1989, Webb pled guilty to grand theft.

[4] The one exception relates to a $20,445 check issued by West Florida Gas to Towers Construction on Jan. 30, 1986, which was deposited into Towers Construction's bank account and then split equally between Briggs and Sandra Morris (Mrs. Morris).

District Court for the Northern District of Florida, pursuant to section 7207 for willfully filing false Federal income tax returns for taxable years 1986, 1987, and 1988.

Before the conclusion of the criminal proceedings against Briggs and Mr. Morris, Towers Construction filed amended income tax returns for at least 1986 and 1987 reporting at least some previously unreported gas rebate income.[5]  The amended returns included Schedules K-1, Shareholder's Share of Income, Credits, Deductions, Etc., reflecting that Briggs and Mrs. Morris were allocated equal shares of all the gas rebate income. Petitioners filed amended individual income tax returns to reflect the amounts of income reported on the amended Schedules K-1.[6]

---

[5] On July 6, 1992, Towers Construction filed untimely amended tax returns for 1986 and 1987.  The record contains no amended return filed by Towers Construction for 1988.  The notices of deficiency, however, make reference to amended Schedules K-1, Shareholder's Share of Income, Credits, Deductions, Etc., from Towers Construction for 1988, reflecting corrected shares of gas rebate payments, from which we infer that Towers Construction filed an amended return for 1988 reporting previously unreported gas rebate income.

[6] On July 6, 1992, petitioners filed amended tax returns for 1986 and 1987.  Briggs also filed an untimely 1988 return on July 6, 1992.  The record contains no amended return for the Morrises for 1988.  The notices of deficiency, however, appear to be predicated on petitioners' having reported on amended returns the amounts of gas rebate income reflected on the amended Schedules K-1 from Towers Construction, from which we infer that the Morrises filed an amended return for 1988 reporting gas rebate income as reflected on the corrected Schedules K-1.

In the notices of deficiency, respondent determined that petitioners had ordinary income from the gas rebate payments in the amounts that they actually received rather than in the amounts reported on the corrected Schedules K-1.

Discussion

Petitioners do not dispute that they received ordinary income from the West Florida Gas rebates, but they disagree with respondent's determination as to the manner in which the income should be allocated between Briggs and the Morrises. On brief, petitioners state that the issue is "whether the gas rebates should go through Towers Construction and pass through to the petitioners equally or be divided according to whom the checks were made out." Petitioners contend that the gas rebates were earned by Towers Construction and should pass through to Briggs and Mrs. Morris equally, each being a 50-percent shareholder.[7]

Respondent replies first, in essence, that if petitioners wanted the gas rebate payments allocated in this manner, they should have done so when they first filed their returns, and second, that respondent's allocation "accurately reflects how petitioners in fact treated the payments."

---

[7] Petitioners' position has the effect of producing equal and opposite adjustments to the Morrises' and Briggs' redetermined taxable incomes.

Neither party has offered any meaningful legal analysis. The only citation of any legal authority by either party appears in respondent's opening brief, which cites without elaboration section 61 for the proposition that petitioners had unreported income from the gas rebate payments. As discussed below, we sustain respondent's determination, but on different grounds.

The parties have stipulated in at least 37 separate numbered stipulations that the gas rebates were "earned by Towers Construction". Two of the checks in question were made payable to Towers Construction. We conclude that the gas rebate payments were gross income to Towers Construction and should pass through to the shareholders--Briggs and Mrs. Morris--pro rata; i.e., equally. See sec. 1366(a), (c).

Our analysis does not end there, however, for the tax treatment of S corporation shareholders takes into consideration not only their pro rata shares of the corporation's items of gross income (the pass-through amounts), but also distributions they receive from the S corporation. An S corporation's distributions to its shareholders may give rise to gross income to the shareholders in excess of the pass-through amounts, depending upon a variety of considerations. See sec. 1368.

Here, the payments of Towers Construction's gas rebates to Briggs and the Morrises represent, in substance, distributions of

Towers Construction's earnings to Briggs and Mrs. Morris.[8]
Thus, we must consider the tax treatment of these distributions.

If an S corporation has no accumulated earnings and profits,
then a distribution is generally excluded from the shareholder's
gross income to the extent of his or her adjusted basis in the S
corporation stock, and distributions in excess of the adjusted
basis are treated as gains from the sale or exchange of property.
See sec. 1368(b).  Although the record is inconclusive on this
point, it appears most likely that Towers Construction had no
accumulated earnings and profits for the years in issue.[9]  The
record is devoid of evidence, however, of Briggs' and Mrs.
Morris' adjusted bases in their Towers Construction stock.
Generally, a shareholder's adjusted basis in S corporation stock

_____

[8] For this purpose, we treat distributions to Mr. Morris,
who was in effect a beneficial owner or coowner of the stock
nominally held by Mrs. Morris, as being with respect to that
stock.

[9] An S corporation may have accumulated earnings and profits
from a variety of sources, including:  (1) As a carryover from
years in which it was a C corporation before it became an S
corporation, see Cameron v. Commissioner, 105 T.C. 380, 384
(1995), affd. sub nom. Broadway v. Commissioner, 111 F.3d 593
(8th Cir. 1997); (2) as S corporation earnings for taxable years
prior to 1983, see H. Conf. Rept. 104-737, at 227 (1996), 1996-3
C.B. 741, 967; and (3) as the result of certain reorganizations
and the like involving the application of subch. C to an S
corporation, as described in sec. 1371(c)(2), see Toberman v.
Commissioner, T.C. Memo. 2000-221.  Towers Construction elected S
corporation status in June 1983.  It appears that Towers
Construction was never a C corporation.  From the sketchy
information contained in the record, it seems most likely that
Towers Construction was never involved in reorganizations and the
like within the meaning of sec. 1371(c)(2).

is increased for his or her share of the pass-through amounts. See sec. 1367(a)(1).[10]  Consequently, we assume that Briggs' and Mrs. Morris' adjusted bases in their stock included their pro rata shares of Towers Construction's gas rebate earnings.  To that extent, the distributions of the gas rebate payments would give rise to no additional gross income apart from the pass-through amounts.  Because petitioners have not shown and the record does not otherwise establish any additional amounts of adjusted basis in their Towers Construction stock, distributions in excess of the pass-through amounts represent additional gross income to Briggs and Mrs. Morris, which generally would be treated as gains from the sale or exchange of property.[11]  See sec. 1368(b)(2).

Without further refinement, this analysis would result in Briggs and the Morrises having, for each taxable year in issue, combined redetermined gross income from the gas rebate payments

_____

[10] An amount that is required to be included in the S corporation's gross income on the shareholder's tax return is taken into account under these basis-adjustment rules only to the extent "included in the shareholder's gross income on his return, increased or decreased by any adjustment of such amount in a redetermination of the shareholder's tax liability."  Sec. 1367(b)(1).  Since we herein redetermine petitioners' gross incomes to include shares of Tower Construction's gas rebate income, their adjusted bases would be increased accordingly.

[11] For taxable years 1986 and 1988, this potential problem affects only Briggs, to the extent he received more than half of the rebates.  For taxable year 1987, this potential problem affects only Mrs. Morris, to the extent the Morrises received more than half of the rebates.

exceeding the aggregate amount of gas rebate payments made to them each year.  Although the rules governing the tax treatment of S corporation shareholders do not foreclose this result, respondent has not sought this result either in the statutory notice or at trial.  In an attempt to reconcile respondent's position in the statutory notices and at trial with the operation of the relevant statutory provisions (which respondent has not cited or alluded to), we construe respondent's position as reflecting a misfounded concession that, for each taxable year in issue, Briggs' and Mrs. Morris' pass-through incomes from Towers Construction did not exceed the amount of payments they each actually received.  Giving effect to this deemed concession cures the problem of attributing to petitioners aggregate amounts of gross income exceeding the aggregate amount of the gas rebate payments, but opens the issue of the character of the gains represented by distributions in excess of the pass-through amounts (as deemed conceded by respondent).[12]  As previously discussed, under section 1368(b)(2), these excess distributions

---

[12]  For example, for taxable year 1986, the total gas rebate payments were $89,175 ($50,677.50 to Briggs and $38,497.50 to the Morrises), and each of them would have pass-through income of $44,587.50 (one half of $89,175), without regard to respondent's deemed concession, which would limit the Morrisses' pass-through income to $38,497.50.  The question then arises as to the character of the $6,090 of rebate payments that Briggs received in excess of his pass-through amount ($50,677.50 less $44,587.50).  Similar considerations apply for each of the taxable years in issue, with the character of the income in excess of the pass-through amounts becoming an issue for the Morrises for taxable year 1987 and for Briggs again for taxable year 1988.

generally would be treated as capital gains from the sale or exchange of property.  Petitioners, however, have not disputed respondent's characterization of the gas rebate payments as ordinary income to petitioners.  Striving for even-handed treatment of geese and ganders, we deem petitioners to have conceded this issue.

In sum, after a long roundabout to apply the statutory analysis that the parties have neglected to favor us with, we sustain respondent's determination on this issue.

## Issue 2.  Basis in Towers Development

Background

### Acquisitions of Land for Development

On May 30, 1985, as part of its plan to develop the Gulf Highlands project, Towers Development purchased 60 acres of land (the phase I land) from Mariners Cove of Panama City Beach, Inc. (Mariners Cove).[13]  This property, located in Bay County, Florida, was to become phase I of Gulf Highlands.  On the same day, Briggs and a business partner, John Lee Daniell (Daniell), purchased from Mariners Cove approximately 40 acres of land (the 40 acres) adjacent to the phase I land.  Eventually, part of the 40 acres was to become phase II of Gulf Highlands.  To finance acquisition of the 40 acres, Briggs and Daniell made a $50,000 cash

---

[13] The record does not reveal the purchase price of the phase I land or the manner in which Towers Development financed the purchase.

downpayment and gave Mariners Cove promissory notes and indentures totaling $1,550,000, with Mariners Cove retaining a security interest in the 40 acres.

Loans From AMI

In May 1985, Associated Mortgage Investors (AMI), a Massachusetts real estate trust, sent Towers Development a commitment letter evidencing AMI's intent to provide a $2.7 million construction line of credit and a $1.5 million acquisition and development loan.  The commitment letter states that the loan will be disbursed in accordance with the terms of a line of credit construction loan agreement.[14]

On May 31, 1985, Towers Development executed various documents, including a real estate note and a mortgage and security agreement, evidencing the $2.7 million construction line of credit from AMI (the line of credit).  The real estate note states that Towers Development agrees to pay to AMI, with interest, the principal sum of $2.7 million "or as much thereof as may be disbursed from time to time."  The mortgage and security agreement gives AMI a first priority security interest in the phase I land and any improvements "now or hereafter" located on the land.  The mortgage and security agreement states that in the event of default by Towers Development, AMI may take

---

[14] The record does not contain the line of credit construction loan agreement or otherwise establish its terms.

possession of the collateral and receive the "rents, incomes, issues, and profits of the Collateral", to be applied to the amount of the "secured indebtedness", defined in the agreement by reference to the "indebtedness evidenced by the [real estate] Note in accordance with the terms thereof".

On May 31, 1985, Briggs and Daniell executed a personal guaranty with respect to the line of credit, agreeing that "if the Debt is not paid by * * * [Towers Development] when due, * * * [Briggs and Daniell] will immediately do so."  AMI also intended to require Mr. Morris' personal guaranty, but because of his past credit problems, his name was struck from all documents.

Also on May 31, 1985, Briggs and Daniell executed a mortgage and security agreement in favor of AMI, evidencing the $1.5 million acquisition and development loan for the 40 acres.  The loans from AMI to Towers Development and to Briggs and Daniell were cross-collateralized.  That is, default under either mortgage would be deemed to constitute a default under the other mortgage, so that AMI could exercise its security interest with respect to the property collateralizing either mortgage.  In the event of default on the Towers Development loan, however, AMI was subordinated to Mariners Cove's security interest in the 40 acres.

To secure its mortgage interest with respect to its loans to Towers Development and to Briggs and Daniell, AMI filed two

separate Uniform Commercial Code Financing Statements in Bay County, Florida, listing Towers Development as the debtor on the loan made directly to Towers Development, and listing Briggs and Daniell as the debtors on the other loan.

On October 15, 1985, AMI provided Towers Development a $1 million increase to the existing $2.7 million line of credit. Again, Briggs and Daniell executed a guaranty in favor of AMI for the loan.

As additional collateral for the $1 million loan increment from AMI, Imperial Pines Development Corp. (Imperial Pines)--a Florida corporation owned equally by Briggs and Mrs. Morris-- conveyed to AMI a mortgage deed with respect to an office building it owned in Bay County, Florida. The agreement provided that AMI would release its security interest in the Imperial Pines property when Towers Development repaid the $1 million loan increment. At some unspecified date, AMI released its security interest in the Imperial Pines property.

On April 29, 1986, Briggs and Daniell sold to Towers Development part of the 40 acres adjacent to the phase I land. On the same date, AMI sent a commitment letter to Towers Development, evidencing an intention to provide a $3.9 million loan to Towers Development for the construction of 158 town house units. The commitment letter stated that the loan would be guaranteed by Briggs and Daniell, and required as additional

collateral that Towers Development pledge a certificate of deposit in the amount of $208,000, the pledge to remain in effect until the sale of 70 town house units. At some unspecified date, Briggs assigned to AMI a certificate of deposit in the amount of $138,666.66 issued by First American Bank and Trust.[15]

Towers Development's Use and Repayment of AMI Loan Proceeds

On all its financing agreements with Towers Development, AMI specified that Towers Development was to use the loan proceeds for purposes that included purchasing land and funding the development and construction of phases I and II of the Gulf Highlands project. With respect to the loans to Towers Development, AMI paid the loan proceeds directly to Towers Development. On its corporate books, Towers Development reported the loans as being from AMI and not from shareholders.

Towers Development made all loan repayments, including principal and interest, not only on its own loans, but also on AMI's loans to Briggs and Daniell. Towers Development made payments to AMI as it sold town house units at Gulf Highlands. Neither petitioners nor Daniell made any payments on the AMI loans. AMI never required Briggs or Daniell to honor his personal guaranty or to surrender assets used as collateral for the loans to Towers Development.

---

[15] The record does not explain the apparent discrepancy between the amount of the certificate of deposit as required in the commitment letter and the amount actually assigned by Briggs.

New Construction Loan

At some point, AMI stopped funding the construction loan. Thereafter, Towers Development completed the Gulf Highlands project with funds provided by various sources, including Towers Construction, Imperial Pines, and other companies, as well as by a new construction loan. The new construction loan, in the amount of $1,947,000, was made on June 30, 1987, by First Federal Savings & Loan Association of Panama City, Florida (First Federal), to Briggs, Daniell, Towers Development, and Towers Construction. Under the terms of the construction loan agreement, First Federal was to provide periodic advances based on the percentage of completion of the construction project, as determined by First Federal. The borrowers agreed to receive the advances and to hold them "as a trust fund for the purpose of paying the costs of construction of the Improvements * * * and for no other purpose." Towers Development made all of the loan payments, including principal and interest, to First Federal. Briggs, the Morrises, Daniell, and Towers Construction made no loan repayments to First Federal.

Not taking into account any adjustment relating to AMI's loans to Towers Development, petitioners' bases in their Towers Development stock for the years in issue were as follows:

|            | 1986  | 1987     | 1988      |
|------------|-------|----------|-----------|
| Briggs     | $581  | $87,106  | $210,142  |
| The Morrises | 581 | 1,106    | 199,490   |

For each of the taxable years 1986, 1987, and 1988, petitioners each claimed, and respondent disallowed, pass-through losses from Towers Development in excess of the basis amounts stated above.

## Discussion

The question, as framed by the parties, is whether, for purposes of determining the pro rata shares of Towers Development losses that petitioners may take into account under section 1366(d), petitioners had bases in their Towers Development stock attributable to the construction loans that AMI made directly to Towers Development.  Relying on Selfe v. United States, 778 F.2d 769, 772 (11th Cir. 1985), petitioners argue that because they were personally liable with respect to these construction loans, guaranteed them, and pledged certain assets to AMI, their bases in their Towers Development stock should include allocable shares of these construction loans.  Disputing petitioners' factual premises and distinguishing Selfe on its facts, respondent argues that because petitioners made no economic outlays with regard to these construction loans, they are entitled to no increased bases therefrom.

An S corporation shareholder generally must take into account a pro rata share of the corporation's income, losses, and

deductions.  See sec. 1366(a).  The aggregate amount of deductions and losses that the taxpayer may take into account generally is limited, however, to the sum of:  (1) The adjusted basis of the shareholder's stock in the S corporation, and (2) the shareholder's adjusted basis in any indebtedness owed by the corporation to the shareholder.  See sec. 1366(d)(1).[16]

Petitioners have failed to establish what balance, if any, was outstanding with respect to the line of credit, or enhancements thereof, between AMI and Towers Development as of each taxable year in question.  AMI was to make loan disbursements to Towers Development in accordance with a line of credit construction loan agreement, but petitioners have put into evidence neither the line of credit construction loan agreement nor other evidence that would credibly establish the amounts and dates of disbursements made by AMI under the line of credit.

AMI extended the line of credit to Towers Development in May 1985.  One of petitioners' witnesses, James Guerino (Guerino), a

---

[16] For the years in issue, the regulations provide that adjustments to the basis of a shareholder's stock and to the basis of indebtedness of an S corporation to a shareholder "must be determined in a reasonable manner, taking into account the statute and the legislative history."  Sec. 1.1367-3, Income Tax Regs.  For the years in issue, return positions are deemed reasonable if consistent with the regulatory rule, expressly applicable to taxable years of corporations beginning on or after Jan. 1, 1994, that adjustments to the basis of a shareholder's stock and to the basis of indebtedness are generally determined as of the close of the corporation's taxable year and are generally effective as of that date.  See secs. 1.1367-1(d)(1), 1.1367-2(d)(1), and 1.1367-3, Income Tax Regs.

former employee of AMI, testified: "I think the initial disbursement on the $2.7 million loan was right at $1 million." There is no evidence what disbursements remained outstanding as of December 31, 1986, or at any other particular time. Guerino testified that "all monies to be paid on that loan would be received as [Gulf Highlands town house] units were sold." The record does not indicate when town house units were sold or for what amounts. Nor does the record indicate that any outstanding balance was due on the AMI construction loan when AMI stopped funding the line of credit at some unspecified date, presumably before June 30, 1987, when Towers Development secured a new construction line of credit with First Federal.[17] Consequently, not only does the record fail to establish the outstanding balance of the line of credit during 1986, 1987, or 1988; the record does not even establish that the AMI line of credit remained in force after June 30, 1987.

The burden of proof is on petitioners. See Rule 142(a). We cannot assume that the many gaps in the evidence support inferences favorable to petitioners; to the contrary, the usual inference is that the missing evidence would be adverse. See

---

[17] The record indicates that AMI's security interest in the Imperial Pines property--which served as collateral for the Oct. 16, 1985, $1 million extension on the original $2.7 million line of credit--was released at some unspecified date, from which we infer that the $1 million loan extension was in fact repaid.

Pollack v. Commissioner, 47 T.C. 92, 108 (1966), affd. 392 F.2d 409 (5th Cir. 1968).

Even if we were to assume, for sake of argument, that there existed some amount of outstanding indebtedness on the line of credit between AMI and Towers Development as of any taxable year in question, petitioners have not established that their Towers Development stock bases should be increased as a result of any such indebtedness.  AMI made the loans directly to Towers Development, which made all repayments, including principal and interest.  Towers Development made every payment to AMI out of funds received from the sale of town houses.  Petitioners made no economic outlays with regard to the loans in question.[18]

This Court and various Courts of Appeals have held generally that a shareholder's guaranty of a corporate loan cannot increase the shareholder's stock basis absent an economic outlay by the shareholder.  See Estate of Leavitt v. Commissioner, 90 T.C. 206 (1988), affd. 875 F.2d 420 (4th Cir. 1989), and cases cited therein.  The Court of Appeals for the Eleventh Circuit has held

---

[18] Petitioners argue that Briggs and Daniell were primary makers on the June 30, 1987, construction line of credit from First Federal and suggest that the loan proceeds were used to pay off the AMI construction line of credit to Towers Development. The record clearly indicates, however, that the First Federal loan disbursements were to be made only as construction progressed on Gulf Highlands, and that these disbursements were to be used solely to pay construction costs.  Furthermore, as previously discussed, the record does not establish that there was any outstanding balance on the AMI construction line of credit when the First Federal loan was obtained.

that, in some circumstances, a shareholder guaranty may be treated as an equity investment where the facts demonstrate that "in substance, the shareholder has borrowed funds and subsequently advanced them to her corporation." Selfe v. United States, 778 F.2d at 773. Under this approach, a key factor is whether "the lender looks to the shareholder as the primary obligor." Id. at 774. The Court of Appeals for the Eleventh Circuit has indicated, however, that it is only "unusual sets of facts that would lead us to conclude that the substance of * * * [a lender's] loans * * * [would] not equal their form." Sleiman v. Commissioner, 187 F.3d 1352, 1359 (11th Cir. 1999), affg. T.C. Memo. 1997-530.

Because appeal of our decision would generally lie in the Court of Appeals for the Eleventh Circuit, we must decide whether Selfe would compel a holding for petitioners on this issue.[19]

The facts do not indicate that petitioners borrowed the funds in issue from AMI and subsequently advanced them to Towers Development. To the contrary, AMI made the loans directly to Towers Development, identifying Towers Development as the debtor in its Uniform Commercial Code Financing Statements relating to the loans in question. AMI designated how Towers Development

_____

[19] We are constrained to follow, if it is directly on point, a holding of the Court of Appeals for the Eleventh Circuit, to which our decision is appealable. See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

could use the funds.  Towers Development reported the loans in its corporate books as loans from AMI to Towers Development.

AMI looked primarily to Towers Development for repayment of the loans in question.  Towers Development put up valuable collateral, in the form of a security interest in the Gulf Highlands project.  As far as the record reveals, it was this collateral that AMI primarily relied upon in extending the line of credit to Towers Development.  Although Briggs also pledged significant collateral, including the $138,666.66 certificate of deposit and his interest in the 40 acres that cross-collateralized AMI's loans to Towers Development and to Briggs and Daniell, the record does not establish that Towers Development would have primarily relied upon this collateral as security for the line of credit.[20]  Guerino testified that AMI did not require more collateral from individuals in part because of the sufficiency of the collateral that Towers Development had put up in the form of the Gulf Highlands property:  "if they build on there and were to rent units, * * * any of the collateral that

---

[20] James Guerino (Guerino) testified that "We took, I believe, some life insurance policies -- paid-up life insurance policies on the principals."  Such collateral is not described in any of the loan documents in the record, however, and Guerino's own testimony is too indefinite on this point to convince us that petitioners provided any such collateral, or if they did, what the value of such policies might have been.

came from those units in the form of rent, * * * et cetera, we were entitled to."

Although Guerino testified that AMI "would not have loaned to * * * [Towers Development] on the strength of that company's assets", we are not persuaded that AMI looked primarily to petitioners as the primary obligors. "It is not surprising that a lender of a loan to a small, closely held corporation * * * would seek the personal guaranty of the corporation's shareholders" or require them to pledge collateral. Spencer v. Commissioner, 110 T.C. 62, 86 (1998), affd. without published opinion 194 F.3d 1324 (11th Cir. 1999). As Guerino's testimony also makes clear, AMI looked to the operating assets of Towers Development, particularly the cash-flow from the Gulf Highlands project, for repayment of cash disbursements under the line of credit. In light of these circumstances, it seems most likely that the cross-collateralization of AMI's loan to Towers Development and to Briggs and Daniell was meant to enhance AMI's security interest in the loan to Briggs and Daniell, rather than the other way around. This conclusion is bolstered by the fact that AMI was subordinated to Mariners Cove in its security interest in the 40 acres that was the primary security for the loan to Briggs and Daniell.

Unlike Selfe v. United States, supra at 769, this is not a case where the lender made loans to the corporation as renewals

of loans originally made to the individual shareholder in his or her individual capacity.  See Spencer v. Commissioner, supra at 84-85.  Indeed, the Morrises did not even personally guarantee the loans in question.[21]  Although Briggs, together with Daniell, personally guaranteed the loans, he made no economic outlay that entitled him to add to his basis in his Towers Development stock.  Moreover, petitioners have not treated the loans in question as personal loans by them to Towers Development.  They have not reported Towers Development's interest payments as constructive dividends, nor have they claimed any interest deductions with respect to the loans.  See id. at 86.

In sum, unlike Selfe v. Commissioner, 778 F.2d at 769, the instant case does not present one of the "unusual sets of facts" that would lead us to believe that the substance of the transactions in question was unfaithful to their form.  Sleiman v. Commissioner, 187 F.3d at 1359.  On the basis of all the evidence in the record, we conclude and hold that AMI looked to Towers Development as the primary obligor on the loans in

---

[21] In fact, AMI mandated that Mr. Morris' name be removed from the loan documents because he had a poor credit history. Imperial Pines Development Corp., which Mrs. Morris owned with Briggs, pledged property to AMI to secure additional financing for Towers Development.  At some unspecified date, however, this security was released when Towers Development repaid the loan. There is no evidence that AMI looked to Mrs. Morris individually for repayment.

question, and the loans that AMI made to Towers Development did not increase petitioners' stock bases in Towers Development.

We sustain respondent's determination on this issue.

Issue 3.  Treatment of Sale of Land Held in Joint Venture

Background

In 1983, Briggs, Mr. Morris, and Daniell agreed orally to form a joint venture to develop and sell real estate in Panama City Beach, Florida (the joint venture).  Mr. Morris was to direct construction, Briggs was to handle negotiations, and Daniell was to handle sales.  None of them put any money into the joint venture.  They agreed to share net profits equally, one-third each.  Because of previous credit problems, Mr. Morris could not hold property in his individual name.  Consequently, Briggs conducted all transactions in his name both for himself and for Mr. Morris.

As part of their joint venture, Briggs, Mr. Morris, and Daniell worked together on at least three different projects--the CharBett Motel, a property known as Holiday Point, and Gulf Highlands.

As previously discussed, in May 1985, Towers Development bought the 60 acres of phase I land, and Briggs and Daniell purchased the adjacent 40 acres in their individual names. Ownership of the 40 acres was split two-thirds to Briggs and one-third to Daniell, with Briggs and Mr. Morris agreeing pursuant to

a gentlemen's agreement to split Briggs' share 50-50 between them.

On July 20, 1985, Briggs, Mr. Morris, and Daniell executed a "letter agreement" which states that its purpose was to "reaffirm the agreement" between the three of them regarding these purchases of real estate. With regard to the phase I land, the letter states the three of them were to share equally in net profits from the construction and development of Gulf Highlands by Towers Development. With regard to the adjacent 40 acres, the letter states: "Any further development * * * is also to be equally shared among * * * [Briggs, Mr. Morris, and Daniell]. All three will share in residual rights, re: telephone, cable television, and development of commercial properties."

On April 25, 1986, after various business disagreements, Briggs, Mr. Morris, and Daniell, with the assistance of outside counsel, executed a written joint venture agreement. The written agreement states that they each have a one-third interest in the joint venture. The written agreement describes the purpose and character of the joint venture as follows:

> The purpose and character of the business of the Venture shall be to engage (i) in real estate activities, (ii) in any related activity associated with any specific project developed by the Venture * * *. Such real estate activities shall include without limitation the acquisition, design, construction, ownership, development, marketing, leasing and sale of commercial property, townhouses, beach resort property, including without limitation those beach resort developments known as

Gulf Highlands Project and all activities necessary and proper to accomplish the foregoing activities.

The written agreement further describes the management and control of the joint venture's activities as follows:

All decisions of the Venture relating to the commencement, design, development, management, financing, pledging, mortgaging, disposition or marketing of any project or business activity of the Venture * * * shall be made only with the unanimous consent of * * * [Briggs, Mr. Morris, and Daniell].

On April 24, 1986, one day before the execution of the written joint venture agreement, Briggs and Daniell sold a small portion of the 40 acres to Sunshine-Jr. Stores, Inc., an unrelated third party. On April 29, 1986, Briggs and Daniell sold the much larger, remaining portion of the 40 acres to Towers Development, which thereafter developed it as phase II of Gulf Highlands.

Later in 1986, Daniell had a further dispute with Briggs and Mr. Morris. In a letter to Briggs and Mr. Morris dated September 5, 1986, Daniell recited various grievances regarding the handling of several of the joint venture's real estate activities. The letter notes that "In the fall of 1983 at the Boar's Head Restaurant, the three of us verbally agreed to begin a Joint Venture on Panama City Beach where all of us would participate equally in all profits generated from all real estate activities on the beach."

On July 16, 1988, Daniell ended his business relationship with Briggs and Mr. Morris by selling them his undivided interest in the joint venture.

On their 1986 individual Federal income tax returns, Briggs and the Morrises each reported the sales of their one-third interests in the 40 acres as long-term capital gains.[22] Respondent determined that the gain was ordinary income.

Discussion

Petitioners argue that the 40 acres was a capital asset because it was "purchased for investment purposes in their individual names, and not in the joint venture's name." They argue that the 40 acres was not held or offered for sale in petitioners' trade or business. Respondent argues that the 40 acres was held by the joint venture as part of its trade or business of acquiring and developing real estate, and consequently was not a capital asset.

Section 1221 defines "capital asset" generally as any property held by a taxpayer, with certain exceptions, including property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business, and real property used in the taxpayer's trade or business. See sec. 1221(1) and

---

[22] On their respective Schedules D, Capital Gains and Losses, Briggs and the Morrises each reported a single sale of a one-third interest in land, with a sale price of $363,333 and basis of $209,980.

(2). Section 1231 mandates capital gain treatment for certain gains and losses recognized on the sale of property used by the taxpayer in a trade or business, even if the property was not otherwise a capital asset, but provides that property used in the trade or business excludes, among other things, property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business. See sec. 1231(b)(1)(B); see also S & H, Inc. v. Commissioner, 78 T.C. 234, 241 (1982).

Resolution of this issue, then, depends on whether petitioners, through their joint venture, held the 40 acres primarily for sale to customers in the ordinary course of business. If they did, the land was not a capital asset. The question is a factual one. The burden of proof is on petitioners. See Rule 142(a).

In 1983, Briggs, Mr. Morris, and Daniell entered into a joint venture to participate equally in profits generated from real estate activities. As reflected in the July 20, 1985, "letter agreement", the joint venture specifically included development of phase I of Gulf Highlands as well as future development of the adjacent 40 acres as phase II of Gulf Highlands. As reflected in the April 25, 1986, written joint venture agreement, the joint venture's real estate activities were intended to include all aspects of acquiring, developing,

and selling commercial property, including the Gulf Highlands resort.

Petitioners argue that the 40 acres was acquired as a passive investment and that the development activities of Towers Development should not be attributed to them. The record is clear, however, that from the outset, Briggs, Mr. Morris, and Daniell had a preconceived plan to develop both the phase I land acquired by Towers Development and the adjacent 40 acres, and to split net profits therefrom equally as part of their joint venture. Briggs testified that the acquisition by Towers Development of the 100 acres making up phase I and the acquisition by Briggs and Daniell of the adjacent 40 acres were structured as separate transactions for tax reasons.[23] About 13

---

[23] On direct examination, Briggs testified as follows:

Q. When you bought this property, did you consult your accountants about the transaction?

A. They recommended that we structured [sic] it that way. They said--and I'm paraphrasing this and I may not be exactly right. It was a long time ago. They said, Well, if you buy it over here--one piece over here--you've got one entity--and this other one here is a different entity, when you get--if this different entity causes some action that causes the value of the land to go up, you know, and you buy--the other entity goes and buys it for the real value of the land, as it went up, but the second one didn't work, well, then you'd be stuck with the land.

But anyway, that would be qualified for what they said was long-term capital gain, and you'd pay less taxes.

months after they acquired the 40 acres, Briggs and Daniell sold it for substantially more than they paid for it.  Most of the 40 acres was sold to Towers Development, which then proceeded to build and sell town house units.

Pursuant to the joint venture agreement as memorialized in the April 25, 1986, written agreement, Briggs, Mr. Morris, and Daniell controlled all decisions relating to any business activity of the joint venture, including the Gulf Highlands project.  On the basis of all the evidence, we conclude that Towers Development acted as the joint venture's agent in carrying on the joint venture's trade or business of acquiring, developing, and selling real estate.  This conclusion is bolstered by the fluid nature of the formal ownership arrangements, whereby Towers Development was nominally owned by Briggs and Mrs. Morris, the 60 acres was nominally owned by Towers Development, and the 40 acres was nominally owned by Briggs and Daniell, even though the joint venture agreement clearly contemplated that Briggs, Mr. Morris, and Daniell were to own equal profits interests in all activities relating to these properties.

We are convinced that the joint venture intended from the outset to develop or sell the 40 acres in the ordinary course of its trade or business, pursuant to the terms of the joint venture agreement as memorialized in the July 20, 1985, letter agreement

and in the April 25, 1986, written agreement.[24]  We conclude that the acquisition of the 40 acres in the names of Briggs and Daniell, on the same date that Towers Development acquired the phase I land from the same seller, and the disposition of the 40 acres about a year later were part of a preconceived, tax-motivated plan by the joint venture to avoid ordinary income treatment of gains realized from appreciation of the 40 acres as phase I of Gulf Highlands progressed.  See Boyer v. Commissioner, 58 T.C. 316, 324 (1972); cf. Ackerman v. United States, 335 F.2d 521 (5th Cir. 1964).

A joint venture conducting a business operation is taxable as a partnership unless it is a trust, estate, or association. See sec. 301.7701-3(a), Proced. & Admin. Regs.  Here, the joint venture was not a trust or estate and had not elected to be taxed as an association; therefore, it is taxed as a partnership.  See id.; see also sec. 761(a) (the term "partnership" includes a

---

[24] On direct examination, Mr. Morris testified as follows:

Q.    What was your intent with respect to this property--
      this 40 acres that you acquired with Mr. Briggs and Mr.
      Daniell?  What were you going to do with the property?

A.    We was [sic] going to develop it out into townhouses
      and commercial property.

Q.    Were you planning to develop it in your own name or as
      a joint venture?

A.    As a joint venture.

joint venture through which any business or venture is carried on, and which is not a corporation, trust, or estate).  The nature of an item of income, gain, loss, deduction, or credit is determined in the hands of the partnership before distribution to the partner.  See sec. 702(b); Podell v. Commissioner, 55 T.C. 429, 432-433 (1970).  Here, the trade or business of the joint venture included the acquisition, development, and sale to customers of real estate.  Consequently, the 40 acres did not constitute a capital asset, and the income realized by the joint venture on the sale of the 40 acres was ordinary income.  See Podell v. Commissioner, supra at 433.

We sustain respondent's determination on this issue.

Issue 4.  Deductibility of Liability Under Letter of Credit

Background

On August 16, 1988, Towers Construction entered into a contract (the construction contract) with Key West Polo Club Apartments, Ltd. (Key West Polo), to build apartments in Key West, Florida.  Because of poor credit, Towers Construction was unable to secure bonding.  On August 22, 1988, Columbus Bank & Trust Co. of Columbus, Georgia (CB&T), established with Towers Construction a $460,000 irrevocable letter of credit (the letter of credit), which states that it was given in lieu of Towers

Construction's furnishing a performance bond to Key West Polo with regard to the construction contract.[25]

On June 19, 1989, Key West Polo sent Towers Construction a notice of default on the construction contract, alleging that Key West Polo had disbursed $3,473,900.48 directly to Towers Construction, relying upon Towers Construction's representations that "you have paid all bills for material and supplies as well as all subcontractors and labor out of funds requested by you and paid by us." The notice of default states that Key West Polo had been advised by various suppliers and subcontractors that "there are considerable balances past due that were to have been paid with funds you received from us".

On July 26, 1989, Key West Polo notified CB&T that Towers Construction had breached the construction contract and requested CB&T to pay Key West Polo $460,000 against the letter of credit. Towers Construction attempted unsuccessfully to enjoin CB&T from making payment to Key West Polo. Although Towers Construction continued to dispute its liability to Key West Polo, CB&T paid $460,000 to Key West Polo.[26] Towers Construction stopped work on the construction contract and filed a claim of lien against Key

---

[25] In consideration for the letter of credit, Columbus Bank & Trust Co. (CB&T) was to receive a share of profits from the construction project.

[26] The record does not reveal the exact date of the payment by CB&T to Key West Polo.

West Polo.  Litigation ensued between Towers Construction and Key
West Polo over the validity of the claim of lien as well as other
matters relating to the construction contract.  The litigation
was not concluded until 1992.[27]

On its 1990 Form 1120S, Income Tax Return for an S
Corporation, Towers Construction deducted $460,000 relating to
the letter of credit payment as part of cost of goods sold,
giving rise to a reported 1990 net operating loss for Towers
Construction.  Briggs and the Morrises filed amended 1987
individual income tax returns, each claiming net operating loss
carryback deductions arising from the pass-through of the claimed
1990 Towers Construction net operating loss.

Discussion

Petitioners argue that in 1990 Towers Construction incurred
a loss of $460,000 as a result of CB&T's payment to Key West Polo
against the letter of credit and that this amount is deductible
pursuant to section 162 as a cost of goods sold because Towers
Construction used the money to pay bills for materials, supplies,
subcontractors, and labor.

Respondent argues that Towers Construction is not entitled
to deduct (and thus petitioners are not entitled to carry back

---

[27] The record indicates that Towers Construction ultimately
lost its lien but does not otherwise establish how this
litigation may have affected any effort by Towers Construction to
recover the $460,000 paid out by CB&T on the letter of credit.

any resulting net operating loss attributable to) any losses associated with the $460,000 letter of credit payment because: (1) Petitioners failed to substantiate the deduction; and (2) the claimed loss arose from a contingent liability that was not determined until 1992, when the litigation between Towers Construction and Key West Polo was concluded.

Cost of goods sold is not a deduction within the meaning of section 162(a) but instead is subtracted from gross receipts in determining a taxpayer's gross income. See Max Sobel Wholesale Liquors v. Commissioner, 69 T.C. 477 (1977), affd. 630 F.2d 670 (9th Cir. 1980); sec. 1.162-1(a), Income Tax Regs. Taxpayers must show their entitlement to amounts claimed as cost of goods sold, see Rule 142(a), and must keep sufficient records to substantiate the cost of goods sold, see sec. 6001; Newman v. Commissioner, T.C. Memo. 2000-345.

Petitioners have failed to document Towers Construction's gross sales or to substantiate any expenses or costs relating to any gross sales. Accordingly, petitioners have failed to establish that Towers Construction is entitled to claim cost of goods sold or, if it is, what the proper amount of cost of goods sold might be.

Petitioners have also failed to establish that the amount in dispute is allowable as an ordinary and necessary business expense under section 162(a). Pursuant to the letter of credit,

CB&T paid Key West Polo $460,000 to discharge Key West Polo's claim against Towers Construction relating to prior advances. CB&T became subrogated to the rights of Key West Polo and had a right of reimbursement from Towers Construction.[28] Thus, CB&T stood in the shoes of Key West Polo, and Towers Construction's liability to repay CB&T was akin to its liability to repay Key West Polo its advances. Clearly, liability to repay an advance, particularly one never taken into gross income in the first instance, does not give rise to a deductible expense under section 162 or otherwise.[29] See Crawford v. Commissioner, 11 B.T.A. 1299, 1302 (1928).

In light of our disposition of this issue, we need not reach respondent's alternative argument that Towers Construction's

---

[28] Applicable Florida law recognizes two types of subrogation--conventional subrogation, which arises from contractual rights between parties, and equitable or legal subrogation, which arises from legal consequences of the acts and relationships of the parties. See Dade County Sch. Bd. v. Radio Station WQBA, 731 So. 2d 638, 646 (Fla. 1999). Although the distinction is not significant for present purposes, it appears most likely that conventional subrogation arose from the contractual rights between CB&T and Towers Construction regarding the letter of credit.

[29] The record does not suggest that Towers Construction or petitioners ever included the $460,000 advance in gross income. Petitioners have not raised, and we do not reach, any issue as to whether Towers Construction's liability to CB&T should be deductible as an amount previously taken into gross income by Towers Construction under a claim of right when it received the advances from Key West Polo. Cf. sec. 1341(a)(1) (in computing tax where the taxpayer repays amounts held under claim of right, the remedial mechanism of sec. 1341 applies only if the item was included in gross income for prior years).

liability to CB&T is a nondeductible contingent liability under section 461(f).[30]

We sustain respondent's determination on this issue.

### Issue 5.  Additions to Tax for Late Filing

Briggs untimely filed his 1986, 1987, and 1988 individual Federal income tax returns on April 28, 1988, February 7, 1990, and February 7, 1990, respectively.  The Morrises untimely filed their 1986, 1987, and 1988 individual Federal income tax returns on May 19, 1988, February 13, 1990, and February 13, 1990, respectively.  Respondent determined that petitioners are liable for additions to tax pursuant to section 6651(a)(1) for the late filing of their 1986 and 1987 Federal income tax returns.[31]

Section 6651(a)(1) imposes an addition to tax if a required return is not filed on or before its due date, unless it is shown

---

[30] Respondent has not raised, and we do not reach, any issue as to whether the deductions in issue are subject to the limitations of sec. 461(h), which provides that certain deductions cannot accrue until there has been "economic performance" with respect to the item.  We note, however, that the record does not conclusively establish that Towers Construction ever reimbursed CB&T for its $460,000 payment to Key West Polo against the letter of credit, or if it did, exactly when.  Mr. Morris testified that Towers Development (rather than Towers Construction) repaid the $460,000 out of proceeds of one of its developments.

[31] Although the parties have stipulated that petitioners filed their 1988 individual Federal income tax returns late, respondent has not asserted sec. 6651(a)(1) additions to tax with regard to the 1988 returns.

that the failure to file is due to reasonable cause and not willful neglect.

Petitioners concede that their 1986 and 1987 Federal income tax returns were filed late. On brief, petitioners argue that they are not liable for the section 6651(a)(1) addition to tax because they reasonably relied on their accountants, who charged much and performed poorly. Although acknowledging that "The tax law does not recognize that the delegation of this responsibility constitutes reasonable cause for not filing", petitioners argue that the law should be otherwise.

We decline petitioners' invitation to revisit legal principles that by their own admission are well established. As stated by the Supreme Court in United States v. Boyle, 469 U.S. 241, 249-252 (1985):

> Congress has placed the burden of prompt filing on the * * * [taxpayer], not on some agent or employee of the * * * [taxpayer]. The duty is fixed and clear; Congress intended to place upon the taxpayer an obligation to ascertain the statutory deadline and then to meet that deadline, except in a very narrow range of situations.
>
> *  *  *  *  *  *  *
>
> It requires no special training or effort to ascertain a deadline and make sure that it is met. The failure to make a timely filing of a tax return is not excused by the taxpayer's reliance on an agent, and such reliance is not "reasonable cause" for a late filing under sec. 6651(a)(1).

We sustain respondent's determination on this issue.

## Issue 6.  Additions to Tax for Fraud

Background

As discussed supra, on their tax returns as originally filed for each year in issue, petitioners omitted from gross income the West Florida Gas rebate checks that had been issued in the individual names of either Briggs or Mr. Morris.  Briggs and Mr. Morris were each convicted by the U.S. District Court for the Northern District of Florida, pursuant to section 7207, for willfully filing false Federal income tax returns for taxable years 1986, 1987, and 1988.

In 1985, Briggs, Mr. Morris, Daniell, and Michael Gay incorporated Association Cable TV, Inc. (ACT), to provide cable television services to a beach resort.  The four were equal shareholders.  In 1988, they sold ACT's assets to Jones Spacelink, Ltd.  In connection with the sale, each of the four shareholders received $199,490 in gross proceeds.  Of this amount, $82,600 represented proceeds from the sale of a covenant not to compete.  Petitioners' 1988 Federal income tax returns each omitted $40,200 of this $82,600 amount from gross income and also omitted $36,000 of other sale proceeds, erroneously characterizing them as "loan repayments".  On brief, petitioners agree to respondent's adjustments increasing each of their taxable year 1988 gross incomes by these amounts, conceding that their return positions were "unexplained and * * * erroneous".

Respondent determined that petitioners are liable for additions to tax for fraud under section 6653(b)(1) for all years in issue. Respondent asserts that for all years in issue, petitioners' omitted West Florida Gas rebate income gave rise to underpayments attributable to fraud. In addition, for taxable year 1988, respondent asserts that petitioners' omission from gross income of ACT assets sales proceeds gave rise to additional amounts of underpayment attributable to fraud.

Discussion

For 1986 and 1987, if any part of any underpayment of a tax required to be shown on a return is due to fraud, there is an addition to tax equal to 75 percent of the portion of the underpayment attributable to fraud, along with 50 percent of the interest due on the portion of the underpayment attributable to fraud. See sec. 6653(b)(1)(A) and (B). For 1988, if any part of any underpayment of a tax required to be shown on a return is due to fraud, there is an addition to tax of 75 percent of the portion of the underpayment that is attributable to fraud. See sec. 6653(b)(1).

Respondent must prove fraud by clear and convincing evidence. See sec. 7454(a); Rule 142(b). Fraud is the intentional wrongdoing of a taxpayer to evade tax believed to be owing. See Petzoldt v. Commissioner, 92 T.C. 661, 698 (1989). A finding of fraud requires a showing that the taxpayer intended to

evade tax known or believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of taxes. See Korecky v. Commissioner, 781 F.2d 1566, 1568 (11th Cir. 1986), affg. T.C. Memo. 1985-63.

Fraud is never presumed but must be proved by clear and convincing evidence. See Petzoldt v. Commissioner, supra at 699. Because direct proof of a taxpayer's intent is rarely available, however, fraudulent intent may be established by various kinds of circumstantial evidence, or "badges of fraud", including consistent, material understatements of income; the filing of false statements or documents; failure to maintain complete and accurate records; the concealing of assets or covering up sources of income; failure to cooperate fully with the Internal Revenue Service; implausible or inconsistent explanations of behavior; illegal activity; and attempted concealment thereof. See Spies v. United States, 317 U.S. 492, 499 (1943); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), affg. T.C. Memo. 1984-601; Korecky v. Commissioner, supra at 1568; Stephenson v. Commissioner, 79 T.C. 995, 1005-1006 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

### The Gas Rebate Payments

Petitioners' consistent and substantial omission of the gas rebate payments from gross income over 3 years is persuasive

evidence of fraud with regard to these items.  See <u>Korecky v.</u>
<u>Commissioner</u>, <u>supra</u> at 1568.

When petitioners met with their accountants to review their tax returns for the years in issue, they did not mention the gas rebate income even though they were asked whether any items of income had been omitted.[32]

Petitioners cashed the rebate checks, deposited them into their personal bank accounts, or, in one instance, deposited the check in Towers Construction's bank account before dividing the proceeds between Briggs and Mrs. Morris.  Petitioners' explanations of their behavior in this regard were implausible and inconsistent.

Petitioners kept inadequate records.  By Briggs' own admission, petitioners were "sorry bookkeepers".  Daniell's accountant testified that the records were "appalling".  The funds of petitioners' various business entities, and possibly their personal funds as well, were commingled in something called an "intercompany" bank account that apparently was in the name of Briggs.[33]  Petitioners disregarded corporate formalities in their

---

[32] Briggs testified implausibly that he informed his accountants of the gas rebate payments "indirectly" by giving them a copy of a newspaper article concerning the rebate program. "I gave them a copy of it.  And I laughed and joked and said, Here you go.  Look at this."

[33] Briggs testified on direct examination that "I didn't have a personal account.  My account was commingled with the
(continued...)

joint venture business operations and used what they referred to as a "funnel method" of accounting, whereby they commingled and directed funds to various entities, making it difficult for even their accountants to associate transactions with specific entities.

It is also significant that Briggs and Mr. Morris were convicted pursuant to section 7207 for filing false Federal income tax returns for the years in issue.[34]  These convictions establish that Briggs and Mr. Morris willfully filed false documents and provide circumstantial evidence of their intention to evade taxes with regard to the gas rebate payments.  See Wright v. Commissioner, 84 T.C. 636 (1985); Pariseau v. Commissioner, T.C. Memo. 1985-124.  Although Mrs. Morris was not convicted, she cashed a number of the rebate checks, as indicated in the appendix, which we view as evidence that she committed fraud along with her husband.

---

[33](...continued)
company account in there."  On cross-examination, Briggs admitted that he also had a personal account.

[34] Respondent does not contend, and we do not conclude, that these convictions under sec. 7207 collaterally estop petitioners from asserting a defense to the fraud penalty.  Cf. Sansone v. United States, 380 U.S. 343, 352 (1965) ("Section 7207 requires the willful filing of a document known to be false or fraudulent in any material manner.  * * * Section 7207 does not require, however, that the act be done as an attempt to evade or defeat taxes.").

Respondent has met his burden of proving by clear and convincing evidence that petitioners acted with the intention to evade taxes in omitting the gas rebate income for each of the years 1986, 1987, and 1988.

Proceeds From Sale of ACT's Assets

Respondent also contends that petitioners acted with fraudulent intention in underreporting the proceeds they each received from the sale of ACT assets in 1988.

Petitioners identified the ACT transaction on their 1988 tax returns and included in gross income well over half of the $199,490 proceeds they each received from ACT's sale of assets. They omitted a portion of the proceeds from the sale of the covenant not to compete and mischaracterized part of the proceeds as repayment of a loan. Respondent has not clearly and convincingly shown that, in reporting over half of the proceeds from this transaction, petitioners acted fraudulently with regard to the remainder.

Respondent asserts that petitioners attempted to disguise the true nature of the "loan repayments". In support of this contention, respondent relies largely on evidence that ACT's accountants advised Daniell's accountant that, consistent with ACT's treatment of the proceeds on its corporate books, Daniell should report part of the proceeds as stockholder loans on his individual Federal income tax return. Respondent has not clearly

established how this evidence pertains to petitioners. Apparently, respondent would have us infer that the advice itself was in some manner fraudulent and that petitioners played a role in it. The record does not clearly support any such inference. The advice that ACT's accountants provided Daniell is consistent with spreadsheets in evidence, apparently prepared by ACT's accountants, which allocated the ACT proceeds partly to loan repayments and partly to other sources, consistent with the manner in which petitioners reported them on their individual tax returns. Without more, it is impossible to know whether ACT's accountants were negligent in doing their work and in giving advice to Daniell's accountant (and presumably to petitioners). There is no evidence to indicate fraud on the part of ACT's accountants.

In Association Cable TV, Inc. v. Commissioner, T.C. Memo. 1995-596, we held that ACT acted with fraudulent intent in representing falsely to the Internal Revenue Service that it had adopted a formal plan of liquidation under section 337, attaching false minutes to its return and treating the sale of its assets as nontaxable on its Federal corporate income tax return. Whatever inferences we might draw from ACT's fraudulent intentions in this regard, we conclude that respondent has failed to meet his burden of proving by clear and convincing evidence that petitioners acted with fraudulent intent in underreporting

the proceeds from the sale of ACT's assets on their individual Federal income tax returns.

Summary

For taxable years 1986, 1987, and 1988, petitioners are liable for the section 6653(b)(1) addition to tax solely as results from their fraudulent underreporting of the gas rebate payments.

Issues 7 and 8.  Additions to Tax for Substantial Understatement

Respondent determined that the Morrises are liable for additions to tax pursuant to section 6661 for taxable years 1986 and 1987, and that Briggs is liable for section 6661 additions to tax for taxable years 1986, 1987, and 1988.

Section 6661 imposes a 25-percent addition to tax on any underpayment attributable to a substantial understatement of income tax.  A substantial understatement of tax is one that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  See sec. 6661(b)(1)(A).  For this purpose, the amount of the understatement is to be reduced by the portion attributable to any item for which there was substantial authority or any item that was adequately disclosed.  See sec. 6661(b)(2)(B).  In addition, the Commissioner may waive all or part of a section 6661 addition to tax upon a showing by the taxpayer that there was reasonable cause for the understatement and that the taxpayer acted in good faith.  See sec. 6661(c).

Petitioners' understatements of income tax each exceed the greater of 10 percent of the tax required to be shown on the returns or $5,000. Consequently, there are substantial understatements within the meaning of section 6661.

On brief, petitioners contend only that they reasonably and in good faith relied on the advice of their accountants in preparing their tax returns. Ostensibly, petitioners seek thereby to invoke the Commissioner's authority to waive the addition to tax pursuant to section 6661(c). The Commissioner's denial of waiver under section 6661(c) is reviewable for abuse of discretion. See Martin Ice Cream Co. v. Commissioner, 110 T.C. 189, 234 (1998). The record does not show that petitioners ever requested respondent to waive the penalty. Accordingly, absent such a request by petitioners, we cannot find that respondent abused his discretion. See id. at 234-235, and cases cited therein.[35]

Even if we were to assume arguendo that petitioners did request waivers pursuant to section 6661(c), petitioners have not established that respondent would have abused his discretion in refusing the requests. Petitioners have not proved that they provided their accountants with complete information for preparing their returns. The evidence shows that the books and

---

[35] Under sec. 6664(c) of current law, effective for returns with a due date after Dec. 31, 1989, no penalty may be imposed for understatements if the taxpayer shows that it had reasonable cause and acted in good faith. See Omnibus Budget Reconciliation Act of 1989, Pub. L. 101-239, sec. 7721(a), 103 Stat. 2398.

records were inadequate, partly because of petitioners' practice of commingling funds and disregarding corporate formalities.  We have determined that petitioners acted with fraudulent intent as regards the omitted gas rebate income.

Although petitioners have not expressly argued that they had substantial authority or made adequate disclosure within the meaning of section 6661(b)(2)(B), on brief they argue that they relied on Selfe v. United States, 778 F.2d at 769.  Any such reliance was misplaced.  As previously discussed, the Morrises did not even personally guarantee the loans in question.  Moreover, petitioners have failed to establish the outstanding balance, if any, of loans between AMI and Towers Development for any year in issue.  Accordingly, we conclude that Selfe and its progeny are "so dissimilar that they must be discarded as providing no substantial authority for the tax returns filed in this case."  Osteen v. Commissioner, 62 F.3d 356, 360 (11th Cir. 1995), revg. on this point T.C. Memo. 1993-519.  Moreover, petitioners have not shown substantial authority or adequate disclosure for other positions taken on their returns.  Opinions rendered by tax professionals are not substantial authority.  See sec. 1.6661-3(b)(2), Income Tax Regs.

We sustain respondent's determination on this issue.

We have considered all other arguments advanced by the parties.  Arguments not addressed herein we conclude are without merit or unnecessary to reach.

To reflect the foregoing,

<u>Decisions will be entered under Rule 155</u>.

## Appendix

### West Florida Gas Rebate Payments to Petitioners

| Date | Payee | Disposition[1] | Briggs | The Morrises |
|------|-------|-----------------|--------|--------------|
| 01/14/86 | Towers Const. | Cashed by FWB | $2,175.00 | -- |
| 01/30/86 | Towers Const. | 070505 (Towers Construction)[2] | 10,222.50 | $10,222.50 |
| 05/27/86 | Jimmy Morris | 402028 (SBM) | -- | 5,220.00 |
| 05/27/86 | Frank Briggs | Bay B&T (FWB) | 5,220.00 | -- |
| 06/05/86 | Frank Briggs | Bay B&T (FWB) | 10,875.00 | -- |
| 06/05/86 | Jimmy Morris | 402028 (SBM) | -- | 10,875.00 |
| 07/03/86 | Frank Briggs | Springfield (FWB) | 2,610.00 | -- |
| 08/07/86 | Jimmy Morris | Springfield (SBM) | -- | 9,570.00 |
| 08/07/86 | Frank Briggs | 402737 (FWB) | 8,265.00 | -- |
| 08/07/86 | Jimmy Morris | Springfield (SBM) | -- | 2,610.00 |
| 08/07/86 | Frank Briggs | 402737 (FWB) | 8,700.00 | -- |
| 11/11/86 | Frank Briggs | Cashed by FWB | 2,610.00 | -- |
| 07/21/87 | Jimmy Morris | 402028 (SBM) | -- | 2,610.00 |
| 08/20/87 | Jimmy Morris | Cashed by JDM | -- | 7,395.00 |
| 09/08/87 | Frank Briggs | Cashed by FWB | 7,395.00 | -- |
| 09/24/87 | Jimmy Morris | Cashed by JDM | -- | 4,350.00 |
| 11/03/87 | Frank Briggs | 390607 (FWB) | 5,220.00 | -- |
| 11/05/87 | Jimmy Morris | Cashed by JDM | -- | 5,220.00 |
| 12/15/87 | Frank Briggs | Cashed by FWB | 1,740.00 | -- |
| 12/15/87 | Jimmy Morris | 2210851 (SBM) | -- | 1,740.00 |
| 02/02/88 | Frank Briggs | 402737 (FWB) | 3,045.00 | -- |
| 02/04/88 | Jimmy Morris | 402028 (SBM) | -- | 3,480.00 |
| 03/01/88 | Frank Briggs | Cashed by FWB | 2,175.00 | -- |
| 03/17/88 | Frank Briggs | 402737 (FWB) | 2,610.00 | -- |
| 03/17/88 | Jimmy Morris | 402028 (SBM) | -- | 2,610.00 |
| 03/31/88 | Frank Briggs | Cashed by FWB | 3,045.00 | -- |
| 03/31/88 | Jimmy Morris | 1118951 (SBM) | -- | 2,610.00 |
| 04/19/88 | Frank Briggs | 390607 (FWB) | 1,305.00 | -- |
| 04/19/88 | Jimmy Morris | 390607 (FWB) | -- | 1,740.00 |
| 06/14/88 | Frank Briggs | Cashed by FWB | 1,305.00 | -- |
| 06/14/88 | Jimmy Morris | 1118951 (SBM) | -- | 1,305.00 |
| 08/02/88 | Frank Briggs | Cashed by FWB | 870.00 | -- |
| 08/02/88 | Frank Briggs | Cashed by FWB | 2,610.00 | -- |
| 08/02/88 | Jimmy Morris | Cashed by JDM | -- | 4,350.00 |
| 09/06/88 | Frank Briggs | 402737 (FWB) | 8,265.00 | -- |
| 09/06/88 | Jimmy Morris | 1118951 (SBM) | -- | 6,525.00 |
| 10/27/88 | Jimmy Morris | 1118951 (SBM) | -- | 11,745.00 |
| 10/27/88 | Frank Briggs | 402737 (FWB) | 10,875.00 | -- |
| 11/22/88 | Frank Briggs | 390607 (FWB) | 7,395.00 | -- |
| 11/29/88 | Jimmy Morris | Cashed by JDM | -- | 3,915.00 |
| | | | $108,532.50 | $98,092.50 |
| | | | | $206,625.00 |

[1] Disposition.   These entries reflect the accounts into which the rebate checks were deposited or the person who cashed them.   FWB refers to petitioner Franklin W. Briggs; JDM refers to petitioner Jimmy Morris; and SBM refers to petitioner Sandra Morris.

[2] Disposition of Check No. 17539.   This rebate check was made payable to Towers Construction and then split equally between Briggs and Sandra Morris.